# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-1592

TY INC.,

*Plaintiff-Appellee, Counterdefendant-Appellee,*

*v.*

SOFTBELLY'S, INC., *et al.*,

*Defendants-Appellants, Counterplaintiffs-Appellants,*

*v.*

TY WARNER,

*Counterdefendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 00 C 5230—**Charles R. Norgle, Sr.**, *Judge.*

_____

ARGUED OCTOBER 20, 2003—DECIDED DECEMBER 22, 2003

_____

Before POSNER, KANNE, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* Ty Inc., the manufacturer of "Beanie Babies," brought suit for trademark infringement against Softbelly's, Inc. and affiliated companies and individuals unnecessary to discuss separately. Softbelly's

manufactures a very similar looking and feeling product that it calls "Screenie Beanies." They differ from Beanie Babies mainly in having chamois bellies and being sold to the public through computer stores for use in wiping computer screens. The case was tried to a jury, but rather than allow it to render a verdict the judge entered judgment as a matter of law for Ty under Fed. R. Civ. P. 50. He awarded Ty both injunctive relief and some $700,000 in damages. He also dismissed Softbelly's counterclaims, which Softbelly's had abandoned in the district court and (though it is anyway too late) seeks halfheartedly to resuscitate on appeal. Cf. *Sokaogon Gaming Enterprise Corp. v. Tushie-Montgomery Associates, Inc.*, 86 F.3d 656, 658 (7th Cir. 1996); *Colburn v. Trustees of Indiana University*, 973 F.2d 581, 593 (7th Cir. 1992). Later he denied Softbelly's motion to vacate the judgment under Fed. R. Civ. P. 60(b)(3) on the ground of witness tampering. Softbelly's challenges this denial as well as the judgment.

The issues at the trial were three. The first was whether "Beanies," which Ty claims to be a common law trademark owned by it (it has a registered trademark on "Beanie Babies"), has become a generic term for small plush toys, in the shape of animals, that are filled with bean-like materials to give the toys a soft and floppy feel. If "Beanies" has become a generic term—has become, that is, beanies— it cannot be a legally protected trademark. The second issue is whether, if "Beanies" has not become generic, the designation "Screenie Beanies" is likely to make consumers think that Softbelly's product is actually a Ty brand. The third issue is whether "Screenie Beanies" dilutes the Beanies or Beanie Babies trademarks.

On the first issue, on which the burden of proof rested on Ty because "Beanies" is not a registered mark, *Mil-Mar Shoe*

*Co. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996); *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999); *Blinded Veterans Ass'n v. Blinded American Veterans Foundation*, 872 F.2d 1035, 1041 (D.C. Cir. 1989), Ty presented the following evidence in an effort to prove that "Beanies" is not generic:

(1) A survey by Dr. Henry Ostberg of 220 men and women over the age of 18, interviewed at nine different malls throughout the country, found that 60 percent of the respondents thought "Beanies" a brand name. Ostberg selected the age-18 cutoff because he was told by Ty that most of the purchasers of beanbag toys are over 18. If 60 percent of the relevant consuming public thinks "Beanies" a brand name, as many of 40 percent may think it generic—and in fact 36 percent of the respondents in Ostberg's survey did. But the legal test of genericness is "primary significance," *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118-19 (1938); *Wesley-Jessen Division of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 865 (7th Cir. 1983); *King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577, 581 (2d Cir. 1963); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12:6 (4th ed. 2003); 5 *id.* § 32:192; and Ostberg's results are evidence that the primary significance of "Beanies" is still as the name of Ty's brand.

(2) A linguist testified that 98 percent of the references in news articles to the word "Beanie" were to Ty's products and that dictionaries do not list it as a generic (lower-case) word.

(3) A statistician sampled eBay and Yahoo auctions and found that more than 80 percent of all references to "beanie(s)" were to Ty's products.

(4) In a phone survey conducted in 1999, more than 60 percent of the respondents identified "Beanies" as relating to Ty or Beanie Babies.

(5) Ty polices the use of "Beanie(s)" vigorously by filing lawsuits, sending cease and desist letters, and opposing trademark applications for the word or its cognates.

This evidence was not conclusive. But Softbelly's presented very little contrary evidence. In fact, the only evidence it placed before the jury was a survey of 13- to 18-year-old girls which found that many of them consider "beanies" the name of the product rather than just Ty's brand name; the testimony of a teenage girl that she considers "beanies" the name of the product; and a statement by Ty Warner, Ty's CEO, that refers to another firm's having sold a "Zoo Beanies" product in 1998. The judge was right that Softbelly's evidence was not enough, in the face of Ty's evidence, to create a triable issue whether "Beanies" is generic. The testimony of one teenager proves nothing at all, and the survey was worthless— 13- to 18-year-old girls being an arbitrary subset of consumers of beanbag stuffed animals. See *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984); 5 McCarthy, *supra*, § 32:159; Robert C. Bird, "Streamlining Consumer Survey Analysis: An Examination of the Concept of Universe in Consumer Surveys Offered in Intellectual Property Litigation," 88 *Trademark Rep.* 269 (1998). Softbelly's argues that Ty Warner has identified teenage girls as his product's largest group of consumers. Not so; in the testimony Softbelly's cites, Warner states that his prime market consists of girls 5 to 14, followed by girls/women 14 to 80. (Of course, this testimony also casts a shadow over Dr. Ostberg's testimony for Ty.) And Warner's reference to "Zoo Beanies" proves nothing at all, for the name might be an infringement of Ty's trademark.

To determine that a trademark is generic and thus pitch it into the public domain is a fateful step. It penalizes the trademark's owner for his success in making the trademark a household name and forces him to scramble to find a new trademark. And it may confuse consumers who continue to associate the trademark with the owner's brand when they encounter what they thought a brand name on another seller's brand. (Think of Ostberg's 60 percent—and there would be a problem even if they were only 10 percent.) The fateful step ordinarily is not taken until the trademark has gone so far toward becoming the exclusive descriptor of the product that sellers of competing brands cannot compete effectively without using the name to designate the product they are selling. Imagine the pickle that sellers would be in if they were forbidden to use "brassiere," "cellophane," "escalator," "thermos," "yo-yo," or "dry ice" to denote products—all being former trademarks that have become generic terms. The problem is not that language is so impoverished that no other words could be used to denote these products, but that if no other words *have* emerged as synonyms it may be difficult for a seller forbidden to use one of the trademarked words or phrases to communicate effectively with consumers.

Sometimes a trademark owner will sponsor a generic term precisely in order to avoid its mark becoming generic. Xerox succeeded with "copier," and "Sanka" was saved from becoming generic by the emergence of "decaf" to denote the product of which Sanka was for long the best-known brand. But because "beanies" is so much shorter and punchier than the alternatives that have emerged so far for designating the product, such as "plush beanbag animals," Ty may be fighting a losing war to keep its "Beanies" trademark from becoming "beanies" a generic term. But it won this battle.

More precisely it won this battle on the basis of the evidence that the judge permitted to be presented to the jury,

as distinct from that evidence plus the evidence that the judge excluded. The excluded evidence consisted of (1) the results of a LEXIS search that revealed generic uses of the term "beanie(s)" in newspapers; (2) an internal Ty memo written by Warner himself in which he said "we want to emphasize our Beanies are not just any Beanies—But special. Set us apart from our competitors' Beanies;" and (3) other internal memos, reporting on trade shows, in which employees of Ty used "Beanies'" in a generic sense, as in: "*Ganz*—has product called FLOPPIES. They are a larger version of the Beanies concept. Heard through rumor mill that they are sold out of their 'beanies' until November." Or: "Plush Images Booth #3350—They had 'beanies' that were similar in look, but fabric was inexpensive and it looked like a cheap knockoff of product." The judge excluded all this (and more) evidence tendered by Softbelly's because Softbelly's had failed to include it in the list of exhibits attached to the pretrial order. He also excluded eBay screens indicating widespread use of "beanies" in a generic sense on the separate ground that Softbelly's had failed to summarize these exhibits. The source of his authority is unclear. It is not Fed. R. Evid. 1006, as the judge thought, because that provision merely authorizes summaries and empowers the judge, if summaries are introduced, to require production of the materials summarized. But we may assume that ordering the making of summaries is inherent in a trial judge's authority to manage a lawsuit in an efficient manner.

Nevertheless the judge was too severe in these rulings, especially when his lenity toward Ty is weighed in the balance. The suit had been filed in 2000, but no trial date was set until December 17 of the following year, when the judge announced that trial would begin on February 1, 2002, only six weeks later. The parties were surprised and jointly

moved for a postponement of the trial to October 31 at the earliest. The judge agreed only to postpone the trial date to March 4, with the final pretrial order due on February 22, though on Ty's motion that deadline was postponed to March 1. Although Ty had retained its expert witnesses long before December 17 when the trial date was announced, it did not disclose those witnesses to Softbelly's until January 28.

Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure requires disclosure of experts to the opposing party no later than 90 days before trial. In a case such as this in which the parties don't learn the date of trial until fewer than 90 days remain, literal compliance with the rule is not possible. But it doesn't follow that the parties should feel free to wait until the eve of trial to disclose their experts. Ty took more than a month to disclose its expert witnesses to Softbelly's, which as a result was unable to depose four of Ty's experts, though it might have been able to depose two of them the week before the trial began.

The district judge agreed that Ty had delayed unreasonably in disclosing its experts but he was content to administer a slap on the wrist in the form of a $20,000 fine payable by Ty to Softbelly's, a payment that didn't help Softbelly's prepare for trial. It would have been better had the judge fixed a new deadline for Ty to disclose its experts, once the 90-day deadline had gone by the board. Indeed, in the absence of such a deadline, it is not clear what rule Ty violated that would authorize the imposition of a fine. But that is a side issue (Ty is not protesting the fine); the pertinent point is that the fine did nothing to repair the harm to Softbelly's from Ty's last-minute disclosure. Yet when Softbelly's inadvertently omitted documents from the exhibit list attached to the pretrial order, the judge, rather than slapping Softbelly's on the wrist, excluded *so* much of

its evidence—even though there was no indication of any prejudice to Ty, which was well aware of the documents because they had been produced in discovery—as to make the trial a farce.

Now it is possible that because the final pretrial order was due only three days before the trial was scheduled to begin, Ty would not have had time to prepare fully to deal with the additional documents that Softbelly's wanted to present. But the judge could have postponed the trial a few days and should have done so anyway to enable Softbelly's to complete deposing Ty's experts. Expedition in the conduct of litigation is highly praiseworthy, but here passed over into unjustifiable impatience. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *United States v. Santos*, 201 F.3d 953, 958-59 (7th Cir. 2000); *McAllister v. FDIC*, 87 F.3d 762, 766 (5th Cir. 1996); *Menendez v. Perishable Distributors, Inc.*, 763 F.2d 1374, 1379-80 (11th Cir. 1985).

We do not criticize the judge for wanting to push the case to a conclusion. When he set the trial date, the parties had had more than a year to conduct discovery. Although he didn't give them much notice, maybe an unexpected slot had appeared in his trial schedule (this happens all the time, because many cases settle on the eve of trial) and he wanted to fill it. And district judges have to wedge civil cases into calendars dominated by criminal trials that must conform to the Speedy Trial Act. But when a judge announces a trial date on short notice, he must allow the parties at least the bare minimum amount of time that they reasonably require to get ready for the trial.

Had Ty asked the judge to enter a final judgment in its favor as a sanction for Softbelly's having submitted an untimely list of documents for trial, the judge would doubtless have refused on the sound ground that sanctions

should be proportioned to wrongs. *Allen v. Chicago Transit Authority*, 317 F.3d 696, 703 (7th Cir. 2003); *Bolt v. Loy*, 227 F.3d 854, 856-57 (7th Cir. 2000); *Nick v. Morgan's Foods, Inc.*, 270 F.3d 590, 597 (8th Cir. 2001); cf. *Ball v. City of Chicago*, 2 F.3d 752, 758 (7th Cir. 1993). The wrong here was minor in culpability and consequences—indeed an understandable result of the judge's effort (which we do not criticize) to hurry the case to trial. But because the omitted documents were the heart of Softbelly's case, the sanction of exclusion that the judge imposed was tantamount to entering judgment for Ty. The sanction was excessive, unreasonable, and so must be reversed. Cf. *Long v. Steepro*, 213 F.3d 983, 986-88 (7th Cir. 2000); *Hathcock v. Navistar Int'l Transportation Corp.*, 53 F.3d 36, 40-41 (4th Cir. 1995).

The judge committed a different kind of procedural error in excluding another item of Softbelly's evidence. One of Softbelly's star witnesses was to be a man named Harold Nizamian, a competitor of Ty for whom Ty Warner had worked before forming his own business. Nizamian was prepared to testify that as early as 1988, before Ty began selling "Beanie Babies," the word "beanie" was being used in the trade names of other manufacturers of "plush bean-bag animals" and indeed that the word had become generic. On the Friday before the Monday on which the trial began, Softbelly's lawyer deposed Warner and in the course of the deposition disclosed that Nizamian would be testifying that "beanies" was a generic term. On Monday, when the lawyer called Nizamian to schedule his testimony, Nizamian said that he had been telephoned by Warner and was no longer willing to testify. Putting two and two together, at the trial Softbelly's lawyer asked Warner whether he had told Nizamian not to testify. Ty objected and the judge sustained the objection.

We do not understand the judge's ruling. If Warner asked Nizamian not to testify, this would entitle the jury to infer that Nizamian's testimony would have supported Softbelly's contention that "beanies" had become a generic term. "[A]n attempt by a litigant to persuade a witness not to testify is properly admissible against him as an indication of his own belief that his claim is weak or unfounded or false." *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3d Cir. 1968); see also *Crabtree v. National Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995). Ty points out that whether a term is generic depends on what consumers think, and that is true, but experienced businessmen know a great deal about what consumers think; that is personal knowledge, *Central Illinois Light Co. v. Consolidation Coal Co.*, 349 F.3d 488, 492-93 (7th Cir. 2003); *Agfa-Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1523 (7th Cir. 1989); *Kansas City Power & Light Co. v. Ford Motor Credit Co.*, 995 F.2d 1422, 1432 (8th Cir. 1993), not hearsay that would require a witness such as Nizamian to be qualified as an expert before he would be permitted to testify to it. Nizamian could easily have been qualified as an expert, which does not require academic-type credentials, *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000); *Circle J Dairy, Inc. v. A.O. Smith Harvestore Products, Inc.*, 790 F.2d 694, 700 (8th Cir. 1986), though Softbelly's did not attempt to do so—and did not have to.

Warner admits that he telephoned Nizamian in order to inquire whether he was going to testify, and after the trial was over Softbelly's lawyer deposed Nizamian who in his deposition stated that Warner had told him that if he testified it would cost Warner "a tremendous amount of

money" and cause "a lot of problems;" that he (Warner) "was involved in the Softbelly's case and that if my statement got into the case. . . it would be very damaging to him." Nizamian added that his situation with respect to Ty was "delicate" because he and Warner had recently discussed the possibility of doing business together and "I realized after speaking to Ty that it was a very important matter to him, and even though I didn't understand all of the particulars, I felt if he felt that strongly about it . . . maybe it would be best if I did not go." Nizamian did not say that Warner had threatened him, but "because of the seriousness in his voice and the importance to him, . . . I figured I'd just rather not get involved." Nizamian's deposition became the basis of Softbelly's Rule 60(b)(3) motion, and we shall get to that in a moment; our present point is only that the judge should not have cut off the lawyer's cross-examination of Warner concerning his phone conversation with Nizamian.

These errors taken together require that there be a new trial, but even if we disregarded them we would have to remand for a new trial on likelihood of confusion. On this issue Ty had the burden of proof, and while it presented some evidence that consumers thought "Screenie Beanies" a Ty product, a rational jury could have concluded otherwise. Although the actual Screenie Beanies so closely resemble Beanie Babies that we were surprised that Ty didn't sue Softbelly's for copyright infringement, the tag attached to each Screenie Beanie does not resemble the distinctive Ty tag very closely, the Screenie Beanies are sold through different outlets, and the suggested retail price of Screenie Beanies is twice that of most Beanie Babies—$10 versus $5. Someone shopping for Beanie Babies would be unlikely to be looking for them in a computer store and if he found them there would wonder why they cost twice as much. This evidence is no more conclusive against a finding of

likelihood of confusion than Ty's evidence was in favor of such a finding, but that is just to say that there was indeed a jury question. We add that determining the likelihood of confusion over a common and simple consumer product is something quite within the ability of jurors, and so judges should not be quick to remove it from them out of a warranted distrust of their ability to decide complex commercial or technical questions.

And finally the judge's ruling as a matter of law that Softbelly's use of the term "Beanies" diluted Ty's "famous" mark (dilution of famous marks now being a violation of federal trademark law, 15 U.S.C. § 1125(c); *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 420-22 (2003)) had scant grounding in the evidence. We've held that "Beanies" (assuming it isn't generic) is indeed a famous mark within the meaning of the federal law, *Ty Inc. v. Perryman*, 306 F.3d 509, 511 (7th Cir. 2002), and even more clearly is "Beanie Babies." *Id.* But there is great doubt whether Ty has proved dilution in this case. After the district court's ruling, the Supreme Court held in the Victoria's Secret case cited above that the statute requires proof of "actual dilution," implying a need for trial-type evidence to determine, in the words of the Court, whether there has been "any lessening of the capacity of the Victoria's Secret mark to identify and distinguish goods or services sold in Victoria's Secret stores or advertised in its catalogs." 537 U.S. at 434. We are not sure what question could be put to consumers that would elicit a meaningful answer either in that case or this one. (We are not alone in having these doubts. Jonathan Moskin, "Victoria's Big Secret: Whither Dilution Under the Federal Dilution Act?," 93 *Trademark Rep.* 842, 853 (2003); 4 McCarthy, *supra*, § 24:94.2.) But in any event no evidence of any sort was presented that would have enabled a trier of fact to infer any lessening in the capacity of "Beanies" or

"Beanie Babies" to "identify and distinguish" the plush beanbag animals sold by Ty.

Ty argues that no consumer survey or indeed any other evidence is required when the allegedly diluting trademark is identical to the allegedly diluted one, citing the following passage in the Supreme Court's opinion: "It may well be, however, that direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can reliably be proven through circumstantial evidence—the obvious case is one where the junior and senior marks are identical." 537 U.S. at 434. The Court did not explain and no one seems to know what that "circumstantial evidence" might be. No matter. Neither "Beanies" nor "Beanie Babies" is identical to "Screenie Beanies."

So the case must be remanded. But the new trial (if one is held—see next point) should be limited to liability, and not revisit damages. Ty presented uncontradicted evidence of Softbelly's gross revenues from the sale of Screenie Beanies. The burden then shifted to Softbelly's to show what part of those revenues represented cost rather than profit. 15 U.S.C. § 1117(a); *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995); *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 124 (9th Cir. 1968). Softbelly's presented no evidence and has no excuse for failing to do so. So if Ty prevails on remand, it is entitled to the damages awarded at the trial under review.

We move now to the Rule 60(b)(3) issue. The rule authorizes the district court to set aside a judgment on the basis of fraud or other misconduct by a party. If it is fraud on the court, the motion may be made at any time, but if it is just fraud on an opposing party, the motion must be made within a year after the judgment sought to be vacated becomes final. We needn't decide which type of fraud is the basis of Softbelly's motion, because the motion was made

within a year. We need not even decide whether the conduct alleged as fraud—that Ty Warner had tampered with a prospective witness for Softbelly's, namely Nizamian (Softbelly's attached Nizamian's deposition in support of its motion)—is better described as "other misconduct" because it did not involve deceit. Misconduct triggers the rule too. Witness tampering is often described as a form of fraud, *King v. First American Investigations, Inc.*, 287 F.3d 91, 94 (2d Cir. 2002) (per curiam); cf. *Fernandez v. Leonard*, 963 F.2d 459, 462 (1st Cir. 1992) (altering documents), and it is certainly very serious—indeed, criminal—misconduct, 18 U.S.C. § 1512(b), and for relief under Rule 60(b)(3) the victim of the fraud or other misconduct need show only that it affected his ability to present his case, not that he would have won had the fraud or misconduct not occurred. *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995); *Square Construction Co. v. Washington Metropolitan Area Transit Authority*, 657 F.2d 68, 72 (4th Cir. 1981); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978).

The district judge's response to the motion was perfunctory. Without conducting a hearing to determine what exactly Warner had told Nizamian, the judge denied relief on the ground that Nizamian had said in his statement "that the reason he would not testify was due to his own time constraints. The witness also stated that he told Ty Warner that he would testify and that Mr. Warner had made no threats or attempted to dissuade the witness from testifying." It is true that Nizamian gave time constraints as one reason for not testifying, but as is apparent from the passages that we quoted earlier from his deposition, that was not the only reason. Indeed, the deposition suggests that it was not the decisive reason. For it was in answer to the question what the "specific reason" for his changing his mind about testifying was that he said that he had "realized after speaking to Ty that it was a very important matter to

him . . . [and] if he felt that strongly about it, . . . maybe it would be best if I did not go." Nizamian was not threatened, but there is very little doubt—if his deposition is believed, and the judge gave no reason to disbelieve it—that Warner attempted to dissuade him from testifying.

Witness tampering is extremely serious misconduct, as we have said, and it would be particularly egregious if committed by a person of Warner's wealth and standing in the business community. We do not say that he did tamper with Nizamian, that if he did it was the cause of Nizamian's not testifying, or that dismissal of the suit would be the only appropriate sanction. And we are mindful of cases that say that fraud, when alleged as a basis for relief under Rule 60(b)(3), must, as was traditionally the case when fraud is alleged, be proved by clear and convincing evidence. *Lonsdorf v. Seefeldt, supra*, 47 F.3d at 897; *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 832 (7th Cir. 1985); *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1998); *Smith v. Reddy*, 101 F.3d 351, 353 (4th Cir. 1996). These cases may be inapplicable to witness tampering, if it is not fraud but other misconduct. They may even be wrong, for as the Supreme Court emphasized in *Grogan v. Garner*, 498 U.S. 279, 288-89 (1991), most federal fraud laws do not require proof by clear and convincing evidence, but only by a preponderance of the evidence. It is unclear to us why Rule 60(b)(3) should be thought to set a higher standard.

We need not decide; all we hold is that Nizamian's deposition, in conjunction with Warner's admission to having called Nizamian on the eve of trial to discuss the case, required further investigation by the judge. Had the judge concluded that Nizamian's version of the phone conversation was accurate, there would have been compelling evidence of serious misconduct on Warner's part, requiring a

commensurately severe sanction, quite possibly dismissal of Ty's suit. *Weibrecht v. Southern Illinois Transfer, Inc.*, 241 F.3d 875, 884 (7th Cir. 2001); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1178-79 and n. 15 (3d Cir. 1993). In hindsight it is apparent that Softbelly's should have protected itself against Nizamian's having a change of heart by taking his deposition before rather than after the trial, but Softbelly's was rushed in its trial preparations and in any event negligence is not a defense to fraud or other deliberate wrongdoing. E.g., *Shropshear v. Corporation Counsel of City of Chicago*, 275 F.3d 593, 597 (7th Cir. 2001); *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 625 (7th Cir. 2000).

Some other issues are raised, but they are either unimportant or likely to wash out at a new trial if one is held.

The judgment for Ty and the order denying Softbelly's Rule 60(b)(3) motion are reversed and the case is remanded for further proceedings consistent with this opinion. Circuit Rule 36 shall apply on remand.

REVERSED AND REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*