THIS OPINION IS A
PRECEDENT OF THE T.T.A.B.

Oral Hearing:                          Mailed:
August 19, 2010                        November 30, 2010

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

In re Trek 2000 International Ltd.

_____

Serial No. 77099785

_____

Julieta L. Lerner, Christopher J. Glancy, Jennifer L. Co
and Thomas C. Flynn, of White & Case LLP for Trek 2000
International Ltd.

Karen P. Severson, Trademark Examining Attorney, Law Office
117 (Brett Golden, Managing Attorney).

_____

Before Bucher, Kuhlke and Cataldo, Administrative Trademark
Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Trek 2000 International Ltd. (applicant), on February
5, 2007, filed an application to register THUMBDRIVE in
standard characters for goods identified as "portable
digital electronic devices for recording, organizing,
transferring, storing, and reviewing text, data, image,
audio and video files; computer software for use in
recording, organizing, transferring, storing, and reviewing
text, data, image, audio and video files on portable

digital electronic devices" in International Class 9.  The application was filed under Trademark Act Section 1(a), 15 U.S.C. § 1051(a), based on acquired distinctiveness under Section 2(f), 15 U.S.C. § 1052(f).  In addition, applicant claimed ownership of Supplemental Register Registration No. 3175651, issued on November 21, 2006, for the mark THUMBDRIVE for various computer-related goods, including "computer hardware and peripherals, computer chips and apparatus used for the acquisition, recording, processing, transmission, storage or output of sound, images, or data, or combination thereof ... drives, namely hard drives, computer disk drives, digital disc drives ... used for the acquisition, recording, processing, transmission, storage or output of sound, images, or data, or combination thereof; discs, namely hard discs, disc memories in the nature of flash memory, and blank computer discs used for the acquisition, recording, processing, transmission storage or output of sound, images, or data, or combination thereof."

The examining attorney initially refused registration under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052, on the ground that applicant's mark is merely descriptive and its declaration of acquired distinctiveness was not sufficient to establish acquired distinctiveness

2

under Section 2(f).  Applicant responded with additional evidence of acquired distinctiveness, whereupon the examining attorney accepted that evidence and approved the application for publication.  The application was published for opposition on March 18, 2008.  After the thirty day publication period passed without drawing an opposition, the examining attorney, on May 1, 2008, requested jurisdiction be restored.  On May 14, 2008, the request was granted and on July 3, 2008, the examining attorney then refused registration under Section 2(e)(1), on the ground that applicant's proposed mark is generic and, as such, unregistrable.  Applicant filed a petition with the Commissioner for Trademarks challenging the restoration of jurisdiction.  Pending disposition of the petition, applicant responded to the refusal.  On January 27, 2009, the petition was denied, and on February 27, 2009, the examining attorney issued a final refusal.  Applicant filed an appeal and a request for reconsideration.  On September 18, 2009, the examining attorney denied the request for reconsideration and the appeal was resumed.

As a preliminary matter, regarding applicant's argument that "it was procedurally improper to restore jurisdiction to the examining attorney [because n]o showing has been made that a 'clear error was made in approving the

3

mark for publication'" (Br. p. 13), it is well established that "questions involving the applicability of the 'clear error' standard are the subject matter of a petition to the Director, and are not proper for consideration by way of an appeal to the Board." In re Jump Designs, LLC, 80 USPQ2d 1370, 1373 (TTAB 2006). As stated in In re Sambado & Son Inc., 45 USPQ2d 1312, 1314-15 (TTAB 1997):

> [T]he question of whether the clear error standard was properly applied is a procedural one arising out of examination practice. The Examination Organization makes the determination of "clear error," which determination ultimately is properly reviewable on petition to the Commissioner. The Board's determination on appeal is to be limited to the correctness of the underlying substantive refusal to register. The Board will not second guess the Examining Organization's procedural determination, that is, the latter's application of the "clear error" standard. As noted, the application of the "clear error" standard is, in this context, a procedural decision (one that answers the question, "Should a new refusal be made and defended by the Examining Attorney?").

See also Trademark Rules 2.63 and 2.146, 37 C.F.R. §§ 2.63, 2.146.

Thus, the Board will not consider the merits of applicant's argument that the refusal is procedurally improper. Jump Designs, 80 USPQ2d at 1373.

In its brief, applicant states that the examining attorney "has refused registration on the ground that the applied for mark is generic for Applicant's goods [and

a]pplicant requests the Trademark Trial and Appeal Board reverse this decision and allow THUMBDRIVE to be registered on the Principal Register." Br. p. 1. The examining attorney, in her brief, while maintaining the genericness refusal, explicitly states that "in the event that an appellate tribunal reverses the finding of genericness, applicant's claim of acquired distinctiveness and the evidence in support thereof is considered sufficient to support registration on the Principal Register under Trademark Act §2(f)." Br. p. 2. Thus, the only issue to be decided is whether THUMBDRIVE is generic for the listed goods.

Whether a particular term is generic, and therefore cannot be a trademark or service mark, is a question of fact. In re Hotels.com LP, 573 F.3d 1300, 91 USPQ2d 1532, 1533 (Fed. Cir. 2009). When a proposed mark is refused registration as generic, the examining attorney has the burden of proving genericness by "clear evidence" thereof. Id. See also In re Merrill Lynch, Pierce, Fenner & Smith, Inc., 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987); and In re Gould Paper Corp., 834 F.2d 1017, 5 USPQ2d 1110, 1111 (Fed. Cir. 1987).

The critical issue is to determine whether the record shows that members of the relevant public primarily use or

understand the term sought to be registered to refer to the category or class of goods or services in question. H. Marvin Ginn Corp. v. International Ass'n of Fire Chiefs, Inc., 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986); In re Women's Publishing Co. Inc., 23 USPQ2d 1876, 1877 (TTAB 1992). Making this determination "involves a two-step inquiry: First, what is the genus of goods or services at issue? Second, is the term sought to be registered ... understood by the relevant public primarily to refer to that genus of goods or services?" Ginn, 228 USPQ at 530. Evidence of the public's understanding of a term may be obtained from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers and other publications. See Merrill Lynch, 4 USPQ2d at 1143, and In re Northland Aluminum Products, Inc., 777 F.2d 1556, 227 USPQ 961, 963 (Fed. Cir. 1985).

In making this determination, we cannot lose sight of the primary purpose behind this policy, which is to prevent competitive harm. As stated in Merrill Lynch, 4 USPQ2d at 1142 (citations omitted):

> Generic terms, by definition incapable of
> indicating source, are the antithesis of
> trademarks, and can never attain trademark
> status. The reason is plain: To allow trademark
> protection for generic terms, i.e., names which
> describe the genus of goods being sold, even when
> these have become identified with a first user,

would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are.

As noted by the Court of Appeals for the Seventh Circuit:

To determine that a trademark is generic and thus pitch it into the public domain is a fateful step. It penalizes the trademark's owner for his success in making the trademark a household name and forces him to scramble to find a new trademark. And it may confuse consumers who continue to associate the trademark with the owner's brand when they encounter what they thought a brand name on another seller's brand. ... The fateful step ordinarily is not taken until the trademark has gone so far toward becoming the exclusive descriptor of the product that sellers of competing brands cannot compete effectively without using the name to designate the product they are selling.

Ty Inc. v. Softbelly's Inc., 353 F.3d 528, 69 USPQ2d 1213, 1215 (7th Cir. 2003). See also In re Bayer Aktiengesellschaft, 488 F.3d 960, 82 USPQ2d 1828, 1837-38 (Fed. Cir. 2007) Judge Newman dissenting (citations omitted) ("Commercial policy and international treaty obligations do not favor depriving trademark owners of valuable commercial rights ... public and private interests are served by recognition of trademark rights, not their gratuitous eradication. ... To deny the statutory federal registration, there must be clear and convincing evidence of the invalidity of that property right and a sound public interest served by its forfeiture.")

The protection of the public interest includes ensuring that sellers who must use a particular term to compete effectively can do so. It is well established that the availability of other words for competitors to use does not, by itself, transform a generic term into capable matter. Blinded Veterans Ass'n v. Blinded American Veterans Foundation, 872 F.2d 1035, 10 USPQ2d 1432, 1437 (D.C. Cir. 1989) ("A term need not be the sole designation of an article in order to be generic..."). However, where the evidence of record does not show that competitors use the designation in issue, this may create doubt, depending on the totality of the record, as to whether a term primarily refers to a genus of goods such that "sellers of competing brands cannot compete effectively without using the name to designate the product they are selling." Ty Inc., 69 USPQ2d at 1215.

In support of her position that the relevant consuming public understands THUMBDRIVE to refer to the genus of goods, the examining attorney highlights several examples from the record, including the following:

> Web page printout from www.google.com defining THUMB DRIVE as "one of many terms used in popular language for USB flash drive";

> Web page printout from www.allbusiness.com defining "USB flash drive" as "a small, keychain-sized flash memory device with a USB interface

(Figure 287), treated by the computer as if it were a disk drive; also called a thumb drive. USB flash drives...";

An excerpt from credoreference.com taken from "High Definition: A-Z Guide to Personal Technology" defining "flash drive" as "A portable data storage device that is small enough to fit in a pocket and can be connected to the USB port of a computer or other device. Flash drives use flash memory chips for storage. Also called flash disk, key drive, thumb drive, USB flash drive, USB key.";

Web page printout from www.pexagontech.com, an online retailer, with the following display,



;

Web page printout from www.inveo.org "Do you have old thumb drives (otherwise known as USB Memory Sticks) at your office or home that you don't use anymore? We're collecting these drives to share with the organizations we work with.";

An article appearing on www.thinkgeek.com displaying a picture of a flash drive that is not from applicant with the following text "This Thumb Drive will self-destruct in 10 seconds... Thumb drives are a convenient and cool way to carry around your data, and with drive sizes in the gigabytes...";

An article appearing on lifehacker.com with the following text "Stay Productive on Your Thumb Drive with Tiny USB Office ... if your thumb drive is already scrimping for space, and you just want a few super-lightweight apps that can handle most general office tasks..." and posted comments, including "...could you please address

9

the safety/security issues behind carrying around your whole digital life on a thumb drive? ... I generally use a combination of my USB thumb drive and Jungle Disk.  I can easily back up any local data files to JungleDisk, which runs on Windows, Mac, and Linux, and supports encryption.";

Commentary from ask-leo.com titled "Can a USB thumbdrive 'wear out'?" which includes "Flash memory, the type of memory used in USB thumb drives and other devices, is very, very cool. ... Now, in your case, you're using USB thumbdrive in perhaps the worst possible way for longevity. ... The best use of USB thumb drives and other flash memory based devices is simply copy-to and copy-from.";

Commentary from tech-yahoo.com titled "Create a Thumbdrive Loaded with Portable Apps in One Easy Step" "... I just opened a drawer in my office to find, literally, a dozen USB thumbdrives just collecting dust.";

An online article from the National Institutes of Health which includes the statement "To minimize the risk of data loss in the event your laptop is stolen, use an encrypted thumb drive to back up sensitive data and keep it separate from your laptop.";

Articles from the "New York Times" Article dated April 24, 2008 ("A Four-Gigabyte Thumb Drive With Two Safety Nets"), "The Houston Chronicle" dated August 22, 2007 ("But consider this list taken from a back to the U cheat sheet on the web: personal audio player, noise-canceling earphones, USB thumbdrive...,"), "St. Louis Post-Dispatch", dated March 7, 2008 ("Heck, you can now buy USB thumbdrives that are as big as 32 GB."), "The Washington Post" dated April 6, 2009 ("To exchange contact information with a new acquaintance, they pointed the sticks, which resembled large thumb drives toward each other and clicked a small button.), and "The Biloxi Sun Herald" ("Thumbdrives are cheap, plentiful"); and

10

An excerpt from a transcript for the National Public Radio Show "Talk of the Nation: Science Friday" aired on September 11, 2009, which includes the following statement by the host Ira Flatow, "Okay can you picture a day when you'll carry a little thumb drive around with you."

The examining attorney contends the "evidence of record is competent and diverse and adequately shows the relevant consumers' understanding of the term THUMBDRIVE as identifying a genus of goods such as those identified in the instant application, thereby supporting the finding that THUMBDRIVE is generic for the identified goods." Br. p. 10. In regard to applicant's prior registration on the Supplemental Register, she argues that "[s]ince examination of that application, the evidence of record shows that the term THUMBDRIVE has become generic." Br. p. 12. Further, citing In re Sun Microsystems, Inc., 59 USPQ2d 1084, 1088 (TTAB 2001) (AGENTBEANS merely descriptive for specific computer software where individual terms are merely descriptive and combined remain merely descriptive) and In re Styleclick.com Inc., 57 USPQ2d 1445, 1448 (TTAB 2000) (E FASHION merely descriptive of Internet retailing services and computer software used in connection therewith), she notes that "[v]ocabulary used in the computer and electronics fields is particularly noted for changing rapidly, and descriptiveness is determined based on the

facts and evidence in the record at the time registration is sought." Br. p. 12. She further notes that "[a] term that was once arbitrary or suggestive may lose its distinguishing and origin-denoting characteristics through use in a descriptive sense over a period of time, and can thus come to be regarded by the purchasing public as nothing more than a descriptive designation." Id.

In traversing the refusal, applicant argues that the examining attorney has not met her evidentiary burden and that, at a minimum, the prosecution history of this application and the prior Supplemental Register Registration, and the evidence of record demonstrate doubt as to whether the mark is generic. In particular, applicant stresses that it relied on the prior determination that led to its registration on the Supplemental Register and since "November 21, 2006, when THUMBDRIVE was placed on the Supplemental Register, Applicant has continued to strengthen and protect its mark." Br. p. 7.

In support of its position, applicant submitted the Declaration of Gurcharan Singh, applicant's Chief Financial Officer and Executive Director, with accompanying exhibits, showing U.S. sales under the THUMBDRIVE brand name, uses of

12

THUMBDRIVE on the Internet by applicant and third parties, and applicant's use on products and packaging.

Through the declaration of Mr. Singh, applicant provides some background as to origin of its asserted mark THUMBDRIVE. In 2000, applicant coined the term THUMBDRIVE and has continuously used it as a brand name since that time. Singh Dec. ¶ 2. Applicant has been designing, manufacturing and selling portable storage devices under the brand name THUMBDRIVE since 2000. Id. Between 2002 and 2007 its U.S. sales have totaled over $4.3 million. Singh Dec. ¶ 6. It advertises its products under the mark THUMBDRIVE in print media and the Internet and has also promoted its products under the brand THUMBDRIVE at industry trade shows in the United States. Singh Dec. ¶¶ 4-5. Applicant authorizes other companies to co-brand and sell USB storage devices bearing the THUMBDRIVE trademark in the United States, including Memorex, Creative Technology Ltd., Imation, Iomega and TEAC. Singh Dec. ¶ 9. Further, applicant "now designs, manufactures and sells a family of THUMBDRIVE branded products, including THUMBDRIVE Touch, THUMBDRIVE Swipe and THUMBDRIVE Tuner portable USB storage devices." Br. p. 2; Singh Dec. ¶ 3.

Applicant's specimens of use show the manner of applicant's use:





Applicant's examples of media usage of THUMBDRIVE as a

brand name are set forth below:

USB flash memory hard drives like the ThumbDrive
range from TREK (www.bytezone.com);

Memorex USB ThumbDrive 64MB USB flash memory
devices strike a chord with the uninitiated.  ...
Most of the desktops and notebooks sold in the
past few years have USB ports, and most desktop
OSes in use support flash devices.  The problem

is when a device inexplicably reads and writes as slowly as a floppy, which happened to me with the Memorex USB ThumbDrive 64MB. Memorex's ThumbDrive is essentially the Trek ThumbDrive Smart. ... (www.computerpoweruser.com); and

Product: Thumbdrive SMART 16MB USB Drive ... Supplied By: Trek USA ... MODTHEBOX would like to thank Lauren & Jyh Shyong from Trek USA for sending the Thumbdrive SMART for review ... World's smallest portable storage drive ... The Thumbdrive SMART is a solid state disk with a USB interface for PC or Mac compatibility. (www.modthebox.com).

In rebuttal to the examining attorney's evidence of what may be characterized as online references (google.com, allbusiness.com and credoreference.com), applicant submitted an excerpt from Wikipedia for the entry "USB Flash Drive" that includes the following:

History First Commercial Product Trek Technology and IBM began selling the first USB flash drives commercially in 2000. Singaporean company Trek Technology sold a model dubbed the "ThumbDrive," and IBM marketed the first such drives in North America, with its product the "DiskOnKey" ... Recently, "USB flash drive" or simply, "UFD" has emerged as the de facto standard term for these devices, although potentially confusing alternatives (such as memory stick) are still prevalent. The myriad different brand names and terminology used, in the past and currently, make UFDs more difficult for manufacturers to market and for consumers to research. Some commonly used names are actually trademarks of particular companies, such as Cruzer, TravelDrive, ThumbDrive, and Disgo.

www.wikipedia.org

15

In addition, applicant submitted search results from Merriam-Webster Online and Bartleby.com showing no listings for THUMBDRIVE.

Applicant also submitted pages from competitors' websites where the term "flash drive" is used as the generic designation of the goods.  Two examples are set forth below:



ironkey.com.



Featured Products

SanDisk Ultra® Backup
USB Flash Drive
The SanDisk Ultra® Backup
USB Flash Drive will help to
protect digital valuables
quickly—at the touch of a
button. With 64GB* you can
back up 19,200 photos or
128 hours of video**!

sandisk.com.

Finally, the record also includes examples of applicant policing its asserted trademark. For example, applicant submitted copies of its letters to and responses from various media outlets, including "PC Magazine" and "The New York Times," whereby they agreed not to use THUMBDRIVE in a generic manner.

We begin by finding that the genus of goods at issue in this case is adequately defined by applicant's identification of goods, namely, "portable digital electronic devices for recording, organizing, transferring, storing, and reviewing text, data, image, audio and video files; computer software for use in recording, organizing, transferring, storing, and reviewing text, data, image audio and video files on portable digital electronic devices." Magic Wand Inc. v. RDB Inc., 940 F.2d 638, 19 USPQ2d 1551, 1552 (Fed. Cir. 1991) ("[A] proper genericness inquiry focuses on the description of [goods or] services set forth in the [application or] certificate of

17

registration.")  More specifically, the genus includes portable digital storage devices and software used in connection therewith.

Turning to the second inquiry, the public's understanding of the term, the relevant public consists of the ordinary consumer interested in purchasing flash drives or portable digital storage devices.

As noted above, the evidentiary burden of establishing that a term is generic rests with the United States Patent and Trademark Office (USPTO) and the showing must be based on clear evidence.  Merrill Lynch, 4 USPQ2d at 1143.

While the record shows use of the term THUMBDRIVE or THUMB DRIVE to refer to a genus of goods, the record also shows the origin of the term as a trademark and extensive use of the term as a trademark.  As stated by Mr. Singh, and not rebutted by the record, applicant created this term and used it as a brand name in connection with a new product on the market.  Moreover, from the outset, applicant used other terminology as the name of the goods, e.g., "external storage device."  This record also shows that "flash drive" is the commonly used term of art for these portable digital storage devices.  We further note that several of the media references presented by the examining attorney involve publications that have agreed to

18

stop using THUMBDRIVE in a generic manner. The examining attorney counters that the proffered examples of media outlet agreements not to misuse the term only pertain to uses brought up by the examining attorneys during prosecution of applicant's applications (both this application and the underlying application of the Supplemental Registration). However, this does not detract from the evidence; rather, it supports applicant's position in that certain of the media outlets present in the examining attorney's evidence have agreed to cease misuse of the term. See In re America Online Inc., 77 USPQ2d 1618 (TTAB 2006). With regard to dictionary definitions, the record shows that the more mainstream reference works (e.g., Merriam-Webster Online, copyright 2007) do not have a listing for THUMBDRIVE. Moreover, two out of the three listings from the examining attorney's evidence, allbusiness.com and credoreference.com, are definitions for another term, "flash drive," where "thumb drive" is merely listed as a synonym, and we view this as weak evidence of genericness.

Finally, while the record includes a few examples of online retailers using the term THUMBDRIVE or THUMB DRIVE in a generic manner, it is quite noticeable that there are no examples of competitors using this term, and applicant

19

submitted excerpts from competitors' websites showing the absence of that term and the use of "flash drive" as the name of the goods. In other words, the evidence does not "demonstrate a competitive need for others to use" this term.[1] Hotels.com, 91 USPQ2d at 1536.

As noted in America Online, the Federal Circuit has addressed a similar case where there was a mixed record on the question of genericness. America Online, at 77 USPQ2d at 1623, citing Merrill Lynch, 4 USPQ2d at 1143. Similarly, here we find that "the evidence of generic use is offset by applicant's evidence that shows not only a significant amount of proper trademark use but also trademark recognition" by third parties. Id. Thus, we cannot conclude that "members of the relevant public primarily use or understand the term sought to be protected to refer to the genus" of the goods. At a minimum, the record creates doubt and we are constrained to resolve that doubt in favor of applicant.

We reiterate that the ultimate purpose behind the prohibition of registration of generic terms springs from a statute that regulates commerce - not the English language. By this decision, we are not undermining the well-

---

[1] We note that during the opposition period no opposition was filed.

established principle that the availability of other words for competitors to use does not, by itself, transform a generic term into registrable matter, but the complete absence of competitor use after ten years of these products being on the market tends to indicate that THUMBDRIVE has not fully entered the public domain.  Today, with a 24-hour news cycle and 24/7 online global activity, undoubtedly many trademarks are misused repeatedly, perhaps, in part, because there is less time for editing and reflection before news reports or blog posts are released, and, in part, because what was the casual spoken word between people is now the written word posted to the world.

The examining attorney argues that the fact that some companies correctly use the term THUMBDRIVE as referencing applicant's goods "does not negate the evidence of record that shows wide and varied use of the term THUMBDRIVE (and/or THUMB DRIVE) in a generic sense such that the relevant consumers perceive the primary significance of the term as generic for external digital storage devices."  Br. p. 13.  In support of this position, she quotes the following passage in the McCarthy treatise:

> For example, if a survey showed that 75% of the public regarded the word as generic, then that is its "principal significance."  Even if the seller educates a few customers to use the generic term as a mark, it is still principally generic.

McCarthy, 12:6.

Notably, that passage continues as follows:

If a majority of buyers regard the term as a generic name, courts can still give limited recognition to any residuary trademark significance in the term.  Thus, even "minority" usage can be accommodated in a carefully worded decree.  If, on the other hand, 75 percent of the public regards the term as an indication of a single commercial source for certain goods or services, then that term should be protected as a trademark or service mark.

Id.

This passage is referencing decisions arising out of infringement cases.  For example, after upholding the finding that THERMOS had become synonymous for vacuum bottle, the court in King-Seely Thermos Co. v. Aladdin Indus., Inc., 321 F.2d 577, 138 USPQ 349, 352-353 (2d Cir. 1963) stated the following:

The court below, mindful of the fact that some members of the public and a substantial portion of the trade still recognize and use the word "thermos" as a trademark, framed an eminently fair decree designed to afford King-Seeley as much future protection as was possible.  The decree provides that defendant must invariably precede the use of the word "thermos" by the possessive of the name "Aladdin"; that the defendant must confine its use of "thermos" to the lower-case "t"; and that it may never use the words "original" or "genuine" in describing its product.  In addition, plaintiff is entitled to retain the exclusive right to all of its present forms of the trademark "Thermos" without change. These conditions provide a sound and proper balancing of the competitive disadvantage to defendants arising out of plaintiff's exclusive

22

use of the word "thermos" and the risk that those who recognize "Thermos" as a trademark will be deceived. ...  The use by defendant of the now generic word "thermos" was substantially curtailed.  Plaintiff's trademark "thermos" was protected in every style of printing except the lower case "thermos" and then the use of the word must be preceded by the possessive of defendant's name "Aladdin" or the possessive of "Aladdin" plus one of defendant's brand names."

We do not have the option of crafting a decree to protect trademark significance while allowing other generic uses.  Before this Board, the decision to allow registration is an "all or nothing" determination.  In circumstances where a coined term used as a trademark is quickly taken up by the public but not by competitors and the stakes are "the fateful step" of full "eradication" of an applicant's "commercial rights," the evidentiary burden is heavy indeed.  While evidence of competitor use is not required to satisfy this burden, where the record demonstrates both trademark and generic uses, evidence of the lack of competitor use, at a minimum, may create doubt sufficient to tip the balance in favor of registration.

Such circumstances are distinguished from cases where a term was in the public domain at the time of adoption by an applicant (see, e.g., In re Ex Parte Pocket Books, Inc., 91 USPQ 182, 185 (Chief Examiner 1951) (POCKET BOOK used in a generic manner since 1617 thus "it is not believed that

usage, advertising and repetition alone and even the acquiescence of the professional trade group, is sufficient to remove the name of an article from the category of a generic word of the English language to that of a trade mark for the article")) or cases where the term in question is simply a combination of generic terms (see, e.g., In re Gould Paper Corp., 834 F.2d 1017, 5 USPQ2d 1110 (Fed. Cir. 1987), (SCREENWIPE, the combination of the generic terms SCREEN and WIPE, generic for television and computer screen cleaning wipes).

In view of the above, the USPTO has not met its burden to establish by clear evidence that THUMBDRIVE is generic for the identified goods. Further, because the examining attorney found that if the term is not generic the evidence shows it has acquired distinctiveness, it is registrable under Section 2(f).

**Decision**: The refusal to register is reversed and the mark in the application will proceed to registration.[2]

---

[2] As noted above, the application has already completed the publication process.