This Opinion is a
Precedent of the TTAB

Hearing: May 11, 2017          Mailed: August 3, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Empire Tech. Dev. LLC*

_____

Serial No. 85876688

_____

Everett E. Fruehling of Christensen O'Connor Johnson Kindness PLLC for Empire
    Technology Development LLC.

Yatsye I. Lee, Trademark Examining Attorney, Law Office 107,
    J. Leslie Bishop, Managing Attorney.

_____

Before Wellington, Shaw, and Larkin,
    Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

Empire Technology Development LLC, successor-in-interest by assignment from

the original applicant, Invention Development Management Company, LLC

("Applicant"),[1] seeks registration on the Supplemental Register of the proposed mark

COFFEE FLOUR in standard characters for "flour made by processing and blending

---

[1] This application was assigned to Empire Technology Development LLC by an assignment
recorded in the Patent and Trademark Office on June 20, 2017 under Reel/Frame 6087/0373.
Because the assignment occurred after the briefing and oral hearing on this appeal, all
references to "Applicant" in this opinion are to the original applicant and assignor.

together coffee cherry skins, pulp, and pectin for use, alone or in combination with other plant and milk based products, as a dry ingredient in food and beverage products for consumer use," in International Class 30.[2]

The Trademark Examining Attorney has refused registration of the proposed mark on the Supplemental Register under Section 23(c) of the Trademark Act, 15 U.S.C. § 1091(c), on the ground that the proposed mark is a generic name for the identified goods, and is thus incapable of distinguishing Applicant's goods. After the Examining Attorney made the refusal final, Applicant timely appealed and requested reconsideration, which was denied. Applicant and the Examining Attorney have filed briefs, and counsel for Applicant and the Examining Attorney appeared at an oral hearing before the panel on May 11, 2017. We affirm the refusal to register.

## I. **Prosecution History and Record on Appeal**

Applicant initially sought registration of its proposed mark on the Principal Register for "processed coffee cherry skins, pulp, and pectin for use, alone or in combination with other plant and milk based products, as an ingredient in food and beverage products." The Examining Attorney issued a first Office Action refusing registration under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e), on the ground that the proposed mark was merely descriptive of the identified goods.[3] The

---

[2] Application Serial No. 85876688 was filed on March 14, 2013 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), on the basis of Applicant's allegation of a *bona fide* intention to use the proposed mark in commerce. As discussed below, the application was amended during prosecution to allege use of the mark in commerce under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a).
[3] June 25, 2013 Office Action.

Examining Attorney made of record dictionary definitions of the words "coffee" and "flour." She also requested additional product information about, and a detailed description of, Applicant's goods.

Applicant responded by traversing the refusal to register and making of record a Product Specification and Technical Data Sheet for its goods, as well as Internet evidence regarding the production of coffee.[4] Applicant simultaneously filed an Amendment to Allege Use claiming first use of its proposed mark in April 2012 and first use of its proposed mark in commerce in June 2013, supported by a specimen of use.

The Examining Attorney issued a second Office Action in which she accepted Applicant's Amendment to Allege Use, maintained and continued the descriptiveness refusal, and issued a second information request requiring Applicant to answer specific questions about the nature, composition, and intended use of its goods, and the significance of the word FLOUR in the proposed mark.[5] Applicant responded to the information request by stating, among other things, that the word FLOUR in the proposed mark "suggests the consistency of the product and its ability to be used in baking and/or incorporation as an ingredient in other products."[6]

The Examining Attorney issued a third Office Action maintaining and continuing the descriptiveness refusal, requiring Applicant to clarify its identification of goods,

---

[4] December 24, 2013 Response to Office Action.

[5] January 22, 2014 Office Action.

[6] July 22, 2014 Response to Office Action at 1.

and noting that the proposed mark appeared to be generic for the identified goods.[7] The Examining Attorney made of record pages from a Wikipedia entry regarding coffee beans and pages from Applicant's website at coffeeflour.com describing Applicant's goods.

Applicant responded to the third Office Action by amending the identification of its goods to "processed coffee cherry skins, pulp, and pectin blended together for use, alone or in combination with other plant and milk based products, as a dry ingredient in food and beverage products for consumer use," and amending its application to seek registration on the Supplemental Register.[8]

The Examining Attorney issued a fourth Office Action continuing the requirement that Applicant clarify its identification of goods and refusing registration on the Supplemental Register under Section 23(c) of the Trademark Act, 15 U.S.C. § 1091(c), on the ground that Applicant's proposed mark is a generic term for the goods.[9] The Examining Attorney made of record Internet evidence that she claims shows that third parties use the proposed mark to refer to flour made from coffee cherries, as well as Applicant's published patent application No. US14/364,925, which seeks a United States patent for a "Process for obtaining honey and/or flour of coffee from the pulp or husk and the mucilage of the coffee bean."[10] The Summary and Background

---

[7] August 13, 2014 Office Action.

[8] February 13, 2015 Response to Office Action.

[9] March 14, 2015 Office Action.

[10] In its appeal brief, Applicant acknowledges ownership of this application. 13 TTABVUE 11. The record does not show that a patent has issued.

portions of the patent application explain in detail the historical dispositions of the "sub-products" of coffee production (the mucilage, and the pulp (or husk) surrounding the coffee bean), as well as the claimed inventions for obtaining "coffee honey" and "coffee flour" from these sub-products. Two days later, the Examining Attorney issued a fifth Office Action superseding the fourth Office Action and continuing the refusal to register the mark on the Supplemental Register and the refusal based upon the indefiniteness of the identification of goods.[11] The Examining Attorney made of record additional pages from Applicant's website.

Applicant responded to the fifth Office Action by traversing the refusal to register on the Supplemental Register.[12] Applicant made of record pages from the Patent and Trademark Office's TSDR database regarding its Registration No. 4806487[13] on the Principal Register for the mark shown below

and its pending application Serial No. 86001293[14] to register the mark shown below

---

[11] In continuing the indefiniteness refusal, the Examining Attorney advised Applicant that its goods "must be clarified because applicant fails to use the common commercial name for the goods, i.e. flour" and because "the goods are in fact a type of flour made from processed coffee cherry products." The Examining Attorney suggested the identification language that Applicant ultimately adopted.

[12] September 14, 2015 Response to Office Action.

[13] Issued on September 8, 2015. The mark is described as "consist[ing] of stylized letters forming the words 'COFFEE FLOUR' where the letter 'O' in the word 'COFFEE' is in the shape of a stylized coffee cherry."

[14] Published for opposition on September 8, 2015. Applicant argues in its brief that this application has matured into Registration No. 4876584, 13 TTABVUE 12, but that registration is not in the record.

# c●ffee flour

both containing disclaimers of the words "coffee flour" and covering "flour made by processing and blending together coffee cherry skins, pulp, and pectin for use, alone or in combination with other plant and milk based products, as a dry ingredient in food and beverage products for consumer use." Applicant also amended its identification of goods to match its other applications to read "flour made by processing and blending together coffee sherry skins, pulp, and pectin for use, alone or in combination with other plant and milk based products, as a dry ingredient in food and beverages for consumer use."

The Examining Attorney issued a sixth Office Action accepting Applicant's amendment to its identification of goods,[15] and making final the refusal to register on the Supplemental Register.[16] The Examining Attorney made of record additional Internet webpages regarding Applicant's product, additional dictionary definitions of "coffee" and "flour," pages from the website of the National Coffee Association answering the question "What is Coffee?," additional pages from Applicant's website, and pages from third-party websites regarding various types of grain-free flours.

Applicant then filed a Notice of Appeal and a Request for Reconsideration. 4 TTABVUE. In its Request for Reconsideration, Applicant made of record a press release issued jointly with Sprouts Farmers Market about a partnership with

---

[15] The amendment misspelled "cherry" as "sherry." The Examining Attorney noted and corrected this typographical error in the sixth Office Action.

[16] October 15, 2015 Office Action.

Applicant, articles from several websites discussing Applicant's product, a letter from the U.S. Customs and Border Protection division of the Department of Homeland Security to Applicant's customs agent in response to a request for a tariff clarification ruling for Applicant's product,[17] a definition of the word "genus" from *A Dictionary of Modern Legal Usage*, a Material Safety Data Sheet regarding Applicant's product, and a three-minute promotional video regarding its new product.

The Examining Attorney denied the Request for Reconsideration, 5-9 TTABVUE, making of record additional webpages regarding grain-free flours identified by the use of the word "flour" together with the name of the source plant, nut, or fruit from which the flour is produced.

## II.    Analysis of Genericness Refusal

"In order to qualify for registration on the Supplemental Register, a proposed mark 'must be capable of distinguishing the applicant's goods or services.'" *In re Emergency Alert Sols. Grp., LLC*, 122 USPQ2d 1088, 1089 (TTAB 2017) (quoting 15 U.S.C. § 1091(c)). "Generic terms do not so qualify." *Id.*; *see also Clairol, Inc. v. Roux Distrib. Co.*, 280 F.2d 863, 126 USPQ 397, 398 (CCPA 1960) ("The generic name by which a product is known is not a mark which can be registered on the Supplemental Register under section 23 because such a name is incapable of distinguishing applicant's goods from goods of the same name manufactured or sold by others.")

---

[17] Applicant's product was classified as falling under Subheading 0901.90.1000 of the Harmonized Tariff Schedule of the United States, which is described in the classification ruling and under Foreign Trade Schedule B of the U.S. Census Bureau, which Applicant also made of record, as covering "Coffee husks and skins." April 14, 2016 Request for Reconsideration at 9-10, 23-24.

"A generic term 'is the common descriptive name of a class of goods or services.'" *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 114 USPQ2d 1827, 1830 (Fed. Cir. 2015) (quoting *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986)). The test for determining whether a proposed mark is generic is its primary significance to the relevant public. *Emergency Alert*, 122 USPQ2d at 1089 (citing *In re Am. Fertility Soc'y*, 188 F.3d 1341, 51 USPQ2d 1832, 1837 (Fed. Cir. 1999)). "Making this determination 'involves a two-step inquiry: First, what is the genus of goods or services at issue? Second, is the term sought to be registered . . . understood by the relevant public primarily to refer to that genus of goods or services?'" *Id.* (quoting *Marvin Ginn*, 228 USPQ at 530).

The Examining Attorney must demonstrate that COFFEE FLOUR is generic by "clear evidence" of generic use. *In re Hotels.com, L.P.*, 573 F.3d 1300, 87 USPQ2d 1100, 1104 (Fed. Cir. 2009); *Emergency Alert*, 122 USPQ2d at 1830 (citing cases).

### A. The Genus of Goods

"[O]ur first task is to determine, based upon the evidence of record, the genus of Applicant's goods . . . ." *In re ActiveVideo Networks, Inc.*, 111 USPQ2d 1581, 1600 (TTAB 2014). The genus of goods is often defined by the identification in the subject application, *see In re Meridian Rack & Pinion*, 114 USPQ2d 1462, 1463 (TTAB 2015); *In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1636 (Fed. Cir. 2016), but we may also "consider evidence provided from Applicant's website and press releases, from third-party websites, and from dictionaries, newspaper articles and other such sources." *ActiveVideo*, 111 USPQ2d at 1600.

Defining the genus "is not an end in itself, but a means towards determining whether a term is generic, *i.e.*, whether consumers understand the term at issue as primarily referring to the goods or services (rather than to the source)." *Id*. at 1602 n.77. "Sometimes an applicant's description of goods/services is simple and clear enough that it may be used verbatim as the 'genus.' Other times, as in this case, distillation of a complicated or lengthy description of goods/services into a clear, more succinct 'genus' greatly facilitates the determination of whether a term is generic." *Id*.

The Examining Attorney argues that Applicant's entire identification of goods in the application, namely, "flour made by processing and blending together coffee cherry skins, pulp, and pectin for use, alone or in combination with other plant and milk based products, as a dry ingredient in food and beverage products for consumer use," adequately defines the genus of Applicant's goods. 15 TTABVUE 6.

Applicant argues that the "evidence of record shows that the genus, or major class or kind, of the goods in question is not COFFEE FLOUR." 13 TTABVUE 11. This argument improperly conflates the first *Marvin Ginn* inquiry—defining the genus of Applicant's goods—with the second inquiry—determining whether COFFEE FLOUR primarily refers to that genus. In its argument regarding the lack of a competitive need to use COFFEE FLOUR as a generic term, however, Applicant states that "consumers are not likely to come to the conclusion that COFFEE FLOUR is the genus of flour made of coffee cherry skins, pulp, and pectin." 13 TTABVUE 14. This suggested genus is a shortened version of the portion of its identification of goods that

- 9 -

reads "flour made by processing and blending together coffee cherry skins, pulp, and pectin . . . ."

We find that "flour made from coffee cherry skins, pulp and pectin," a modified version of Applicant's suggested genus, is more succinct and useful in our analysis under the second *Marvin Ginn* inquiry than is the entire identification of the goods in the application, which also includes language specifying how the goods are made and used.[18] "Flour made from coffee cherry skins, pulp and pectin" "capture[s] the essence of the *genus* involved herein, using somewhat fewer words than [was] required by the Office in order for this Applicant to present a definite identification of goods . . . ." *Active Video*, 111 USPQ2d at 1602.

### B. The Relevant Purchasing Public's Understanding of COFFEE FLOUR

We turn now to the second inquiry under *Marvin Ginn*, whether COFFEE FLOUR is understood by the relevant public primarily to refer to flour made from coffee cherry skins, pulp and pectin.

#### 1. Defining the Relevant Purchasing Public

We must first identify the relevant purchasers of the goods. *Id.* We again refer to the record to do so. *See, e.g.*, *In re Tennis Indus. Assoc.*, 102 USPQ2d 1671, 1674 (TTAB 2012).

---

[18] In a response to an information request during prosecution, Applicant stated that the word "flour" in its proposed mark suggests the product's "ability to be used in baking and/or incorporation as an ingredient in other products." July 22, 2014 Response to Office Action at 1. The record enables us to determine how, and by whom, flour made from coffee cherry skins, pulp and pectin is used for purposes of our analysis under the second *Marvin Ginn* inquiry.

The Examining Attorney argues that "the relevant public is the purchasing or consuming public for the identified goods," which she argues comprises "ordinary consumers who purchase applicant's goods, because there are no restrictions or limitations to the channels of trade or classes of customers." 15 TTABVUE 7-8 (citing *Sheetz of Delaware, Inc. v. Doctor's Assocs., Inc.*, 108 USPQ2d 1341, 1351 (TTAB 2013) (citing *Magic Wand Inc. v. RDB Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1553 (Fed. Cir. 1991)). She does not specifically identify the "ordinary consumers who purchase applicant's goods."

Applicant does not expressly address this issue. The closest that it comes to defining the relevant purchasing public is its listing of various persons in its rhetorical question "ask any coffee drinker, chef, baker, pastry lover or other relevant consumer, what is COFFEE FLOUR?" 13 TTABVUE 16.

The record includes the various articles regarding cooking and baking with Applicant's product discussed below, and on that basis we find that the relevant purchasing public for the genus of flour made from coffee cherry skins, pulp and pectin consists of persons who use flour for baking or as an ingredient in foods and beverages, including retailers who sell foods and beverages, restaurants, bakeries, producers and sellers of foods and beverages, and members of the public who cook and bake.

2. **The Evidence Regarding the Relevant Purchasing Public's Understanding of COFFEE FLOUR**

"Evidence of the public's understanding of a proposed mark may be obtained 'from any competent source, such as consumer surveys, dictionaries, newspapers and other

publications.'" *Princeton Vanguard*, 114 USPQ2d at 1830 (quoting *In re Northland Aluminum Prods., Inc.*, 777 F.2d 1556, 227 USPQ 961, 963 (Fed. Cir. 1985)). The United States Court of Appeals for the Federal Circuit has also "made it clear that the way an applicant uses an alleged mark (or a component term in a mark), or the goods or services in connection with which it uses the alleged mark, in promotional materials or packaging, is relevant to whether consumers will perceive the mark as an indicator of source or instead as descriptive or generic." *ActiveVideo*, 111 USPQ2d at 1590 n.22 (citations omitted); *see also In re Gould Paper Corp.*, 834 F.2d 1017, 5 USPQ2d 1110, 1112 (Fed. Cir. 1987).

We emphasize that this appeal involves the rare situation in which Applicant has created a new genus of goods by being the first (and, according to the record, the only) producer and seller of a new product—flour made from coffee cherry skins, pulp and pectin. Professor McCarthy has described the branding challenges facing a category creator like Applicant as follows:

> The situation of a new product with a name which is first used by the seller, is the classic context in which a name becomes generic. That is, a seller comes on the market with a product the public has never seen before. What will the public call it? If the public adopts as the generic name of the thing the word that the seller thinks is a mark, then it is no longer a mark at all. . . . The critical period is when the product first hits the market. It is then that the public will adopt a name for it. In many cases, the seller only realizes what is happening to the word after it is too late. The seller struggles mightily to educate the public to use some name other than the term he wants to call his mark. But it may be to no avail.

> . . .

> In many of the reported cases holding a term generic, blame could be laid at the door of the seller who brings out a new and unfamiliar product and does not give the product an easily recognizable generic name *in addition to* the term which the seller considers to be its trademark. . . . When a new and unfamiliar product, such as a new electronic device, arrives on the market, precautions must be immediately taken to protect the trademark significance of a new designation to prevent its becoming a generic name free for all to use. The seller has options. It could create a generic name for the product and use as a trademark a mark which has been previously used on other goods. . . The company that wishes to have a new trademark for a new and unfamiliar product will have to devise *two* new words—the mark and the generic name.

*McCarthy on Trademarks and Unfair Competition*, §§ 12.25, 12.26 (4th ed., June 2017 Update) ("*McCarthy*").

"[T]he fact that an applicant may be the first or only user of a generic designation . . . does not justify registration if the only significance conveyed by the term is that of the category of goods." *In re Greenliant Sys. Ltd.*, 97 USPQ2d 1078, 1083 (TTAB 2010) (citations omitted). The law does not permit "anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first." *KP Permanent Make-Up, Inc. v. Lasting Impressions, Inc.,* 543 U.S. 111, 72 USPQ2d 1833, 1838 (2004) (citation omitted). Applicant, as the category creator, had the opportunity— and the obligation—"to educate the public to use some name other than the term [it] wants to call [its] mark." *McCarthy*, § 12.25. The obligation arises in part from the need of prospective competitors to use a generic term when marketing their own versions of goods with the same attributes. As the Federal Circuit has explained, "[t]o allow trademark protection for generic terms, *i.e.*, names which describe the genus of goods being sold, even when they have become identified with a first user, would

grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are." *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1142 (Fed. Cir. 1987). *See also In re Pennington Seed Inc.*, 466 F.3d 1053, 80 USPQ2d 1758, 1762 (Fed. Cir. 2006) (applicant who designated "Rebel" as the varietal name for its grass seed under the Plant Variety Protection Act and who "failed to associate any additional word with the Rebel grass seed that would indicate the seed's source" was "prohibited from acquiring trademark protection for the generic and only name of that variety of grass seed.").

The record evidence here is derived almost entirely from the "critical period . . . when the [COFFEE FLOUR] product first hit[] the market," *McCarthy*, § 12.25, so in determining the relevant purchasing public's understanding of COFFEE FLOUR under the *Marvin Ginn* test, we will consider all of the record evidence, including: (1) whether Applicant has adopted an existing generic term, or developed a new one, and has used that generic term together with its proposed COFFEE FLOUR mark; (2) whether Applicant has promulgated to the relevant purchasing public a generic term other than "coffee flour" for its new product; and (3) whether Applicant has policed the misuse of "coffee flour" as the generic term for the new genus, and otherwise has taken steps "to educate the public to use some name other than the term [it] wants to call [its] mark." *Id.*

### a. The Dictionary Meanings of the Elements of the Proposed COFFEE FLOUR Mark

We turn first to the meaning of the words "coffee" and "flour" comprising the proposed mark. A dictionary entry in the record defines "coffee" as, *inter alia*, "[a]ny

of various tropical African shrubs or trees of the genus Coffea, especially C. Arabica or C. canephora, widely cultivated in the tropics for their seeds that are dried, roasted, and ground to prepare a stimulating aromatic drink." October 15, 2015 Office Action at 58 (*The American Heritage Dictionary* (ahdictionary.com), accessed October 9, 2015).[19]

"Flour" is defined as "[a]ny of various similar finely ground or powdered foodstuffs, as of cassava, chickpeas, or bananas." October 15, 2015 Office Action at 60 (*The American Heritage Dictionary* (ahdictionary.com), accessed October 9, 2015). The word "flour" appears in Applicant's identification of goods, and Applicant acknowledges that it is a generic word as used in Applicant's mark. 13 TTABVUE 12.

Relying primarily on these dictionary definitions, the Examining Attorney argues that COFFEE FLOUR "is a generic compound term because each of the constituent words, 'COFFEE' and 'FLOUR,' is itself generic, and when combined, the composite lends no additional meaning to the total combination." 15 TTABVUE 7. Given that

---

[19] The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), including online dictionaries that exist in printed form or regular fixed editions. *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006). We take judicial notice of an additional definition of "coffee" from the *Merriam-Webster* dictionary (merriam-webster.com, accessed on August 2, 2017) in which "coffee" is similarly defined, but is referred to as a plant: "any of several Old World tropical plants (genus Coffea and especially C. Arabica and C. canephora) of the madder family that are widely cultivated in warm regions for their seeds from which coffee is prepared." Coffee is also referred to interchangeably as a plant and as a tree in pages from the website at howstuffworks.com made of record by Applicant, December 24, 2014 Response to Office Action at 4, in a Wikipedia page regarding coffee beans made of record by the Examining Attorney, August 13, 2014 Office Action at 7, and in pages from the website of the National Coffee Association answering the question "What is Coffee?" made of record by the Examining Attorney. October 15, 2015 Office Action at 62-63. Applicant's website (depicted and discussed below) also refers to the coffee plant.

the record includes evidence of the public's understanding of the compound term, including evidence of Applicant's own use of it, we should not rely on the dictionary definitions of the individual words alone. *See Princeton Vanguard,* 114 USPQ2d at 1832 ("Regardless of whether the mark is a compound term or a phrase, the applicable test is the same and the Board must consider the record evidence of the public's understanding of the mark as a whole."). The dictionary definitions of the individual words "coffee" and "flour" in the proposed mark are probative of the public's understanding of their combination as "coffee flour," but they do not, in this case, give us the complete picture.

As noted above, Applicant concedes that "flour" is a generic term as it is used in Applicant's identification of goods and in its proposed COFFEE FLOUR mark. This is significant because there is extensive evidence in the record showing that the relevant purchasing public has been exposed to numerous types of flour identified by the use of the name of the source grain, plant, fruit, vegetable, bean, or nut from which they are made. They include almond flour, apple flour, barley flour, banana flour, bean flour, butternut squash flour, chestnut flour, coconut flour, corn flour, garbanzo bean flour, hazelnut flour, potato flour, quinoa flour, rice flour, soy flour, tapioca flour, and yam flour. October 15, 2015 Office Action at 75-86, 88-90, 93-95, 101, 104-105, 107-108, 111-116.

On the basis of this evidence, we agree with the Examining Attorney that the combination of the words "coffee" and "flour" in the proposed mark yields "essentially the apt or common name for the genus of goods at issue," 15 TTABVUE 7, which is a

new type of flour made from coffee cherry skins, pulp and pectin. Applicant's co-founder Dan Belliveau confirmed that "coffee flour" is the apt generic term for the new product in an interview that he gave in October 2015, which is discussed in more detail below. In response to the interviewer's question "can you tell me how you got the idea for coffee flour?," Mr. Belliveau explained that during a discussion with the owner of a coffee roasting company about what could be done with rotting coffee cherries, he thought to himself "why can't we take this, grind it up, and use it for something? And the words 'coffee flour' just came into my head." October 15, 2015 Office Action at 53.

Applicant also confirmed the aptness of "coffee flour" as the generic term for the product by using it as such in multiple places in its application to patent what it called a "Process for obtaining honey and/or flour of coffee from the pulp or husk and the mucilage of the coffee bean." March 16, 2015 Office Action at 11. Claim 5 in the application covers a "process for obtaining coffee flour from the pulp or husk of the coffee bean" consisting of multiple steps, after which "the product . . . is . . . then packed, stored and commercialized." *Id.* at 12. Applicant identified "the product" as "coffee flour." Applicant similarly used "coffee flour" generically in its description of Figure 3, "a flow chart for the process of obtaining coffee flour from the process of FIG. 1," *id.* at 18, in Table 5, which is a "Compositional Comparison of Coffee Flour and Corn," *id.* at 25, and elsewhere in the application. *Id.* at 18-19, 21.

While "[a]ptness is insufficient to prove genericness," *Am. Fertility Soc'y*, 51 USPQ2d at 1836, the aptness of "coffee flour" as the generic term for Applicant's new

product, which appears to be among the latest in the long list of non-grain flours discussed above, makes it likely that "coffee flour" will be understood as the generic name of the goods unless Applicant "educate[s] the public to use some name other than" coffee flour to identify the new genus of goods. *McCarthy*, § 12:25. We thus review Applicant's own use of COFFEE FLOUR to determine whether Applicant adopted or developed, and then used, a generic term other than "coffee flour," and whether Applicant successfully promulgated that generic term to the relevant purchasing public, resulting in the public's understanding of "coffee flour" as Applicant's trademark rather than as the generic name of Applicant's goods.

### b. Applicant's Own Use of COFFEE FLOUR

Applicant argues at length that COFFEE FLOUR is not the generic term for its product, but in its brief it never states exactly what the generic term is.[20] At one point, Applicant seems to suggest that "flour" alone is the generic term when it argues that COFFEE FLOUR "is merely a combination of the generic word 'flour' to which the descriptor 'coffee' has been applied." 13 TTABVUE 12.[21] At another point, Applicant argues that "there are other ways [than coffee flour] to describe the Applicant's products," offering as examples "'powdered coffee cherry skins, pulp pectin,' or 'finely ground coffee cherry skins, pulp and pectin,'" 13 TTABVUE 15, but stops short of

---

[20] In Applicant's request for reconsideration, Applicant argued that the "generic name for Applicant's goods would be 'coffee cherry skin, pulp, and pectin flour' or 'coffee husks and skins' as set forth in the tariff classification – not 'coffee flour.'" 4 TTABVUE 2. It does not maintain that position on appeal.

[21] We address below Applicant's related argument that its proposed mark is merely descriptive rather than generic.

claiming that these hypothetical generic terms are the actual generic terms for its new product.

"It is well established that the availability of other words for competitors to use does not, by itself, transform a generic term into capable matter." *In re Trek 2000 Int'l Ltd.*, 97 USPQ2d 1106, 1109 (TTAB 2010). More importantly, the record is devoid of evidence that Applicant or the public has ever used these hypothetical generic terms—or anything other than "coffee flour" itself—as the generic term for Applicant's new product. Applicant's failure to provide a generic term other than "coffee flour" in its brief to the Board mirrors what the record shows to be its failure to provide a generic term other than "coffee flour" to the public. As discussed below, this failure contributed to the public's understanding of "coffee flour" as a generic term, not a trademark.

The most pertinent portions of the record reflecting Applicant's own use of COFFEE FLOUR are Applicant's specimen of use and three-minute promotional video, 13 TTABVUE 4, made of record by Applicant, and pages from Applicant's website at coffeeflour.com, made of record by the Examining Attorney. These portions of the record reflect the way in which Applicant chose to use its proposed mark and to describe its new product in its own public-facing materials. Applicant's brief makes the conclusory claim that its "use of 'Coffee Flour' on its website and in other promotional and press materials is clear trademark usage and, therefore, cannot be treated as generic," 13 TTABVUE 14, but Applicant never addresses its specific uses or their impact on the relevant purchasing public's understanding of "coffee flour."

### i. Applicant's Specimen of Use

Applicant's specimen of use is depicted below.



Applicant's product label does not bear Applicant's hypothetical generic terms. While it uses "coffee flour" in prominent stylized lettering, in the position and manner of a trademark, no separate generic term for the product accompanies the putative mark. In the absence of a separate generic term, the use of the phrase "the new impact food for the world" directly below "coffee flour" suggests that "coffee flour" *is* the new impact food, not the brand name identifying the goods of one seller of the "new impact food."

### ii. Applicant's Video

In its description of the record, Applicant states that its video "describ[es] the story of Applicant's product and its creation from coffee cherry husks and skins." 13 TTABVUE 4. Applicant does not discuss the video elsewhere in its brief, but on the basis of a page from Applicant's website in the record, we can infer that the video has been available on Applicant's website. March 16, 2015 Office Action at 26. The video

vividly illustrates Applicant's choice, in its own controlled and sophisticated messaging, to use "coffee flour" to refer to a new type of flour made from coffee cherry skins, pulp and pectin.

The video in the record does not use voice narration, but relies instead on a series of graphic images accompanied by words, an example of which is reproduced immediately below.



The "story of coffee flour" is told largely from the perspective of coffee-growing communities, which the video explains can benefit economically, socially, and environmentally from the production of a new product made from coffee cherries, which, the video also explains, have traditionally been discarded or left to rot when coffee beans are harvested. This theme is illustrated by the image reproduced immediately below.



The video describes the marketability of coffee flour on the basis of its ease of production, its comparative health benefits "*vs. other flours*," and its versatility as an ingredient in foods. The comparative health benefits "vs. other flours" are illustrated by the images reproduced immediately below.





The video also touts the new product's versatility, as illustrated in the images reproduced immediately below, and its potential as "one of the most important ingredients of our time" and "the impact food for the world."





The video concludes with a call to action on the part of viewers. It states "Now It's Up To Us To Make It Come True" and asks viewers to "Please sign up for Coffee Flour updates to learn about how you might get involved."

"Coffee flour" is treated throughout the video primarily as the name of a new product category, flour made from coffee cherry skins, pulp and pectin, not as a trademark. The video's messaging encourages viewers to "get involved" with this new product category as part of responsible world citizenship, not necessarily to buy a particular brand of flour made from coffee cherry skins, pulp and pectin sold by Applicant under the name "coffee flour." Viewers of the video would understand

"coffee flour" to refer to a new type of flour made from coffee cherry skins, pulp and pectin, rather than as the trademark of one producer of that new product.

### iii. Applicant's Website

The record also contains pages from Applicant's website featuring Applicant's product. Representative pages (or pertinent portions of pages) from Applicant's website are reproduced below.[22] We discuss the pages in the text that immediately follows them.



---

[22] The highlighting and other emphasis in all of the materials from the record reproduced in this opinion were supplied by the Examining Attorney during prosecution.

Serial No. 85876688



…An agricultural innovation with the potential to do some really great things for the world. And we don't just mean the food world.

Each year the billions of coffee beans that eventually make their way into the Americanos, lattes, and no-foam, extra-hot, triple-shot cappuccinos of the world are harvested by milling and



For farmers and families in coffee growing countries, it will create sustainable jobs and a new revenue source for some of the poorest areas of the world. For the environment, it will remove botanical waste from streams and soil, strengthening the land and lives of the people and species there. And for the rest of us, it will add a nutritious and distinctly flavorful ingredient to the global menu.

What we're most proud of is that we've structured our business model so that the positive social, environmental, and economic impacts will be shared by all.

*coffee flour™ is set for commercial rollout in 2015. Please contact us if you are interested in participating.

## news updates



**James Beard Award-Winning Chef Now Creating with coffee flour™!**



**Mexico's Bad Harvest: How coffee flour™ Could Help**



**coffee flour™ Creates New Jobs in Nicaragua!**

coffee flour™ was introduced to begin 2013, and there was much more to the story of coffee flour™ and how much impact it could have worldwide in addition to the [...]

Xaltha, Mexico, lies in the state of Veracruz, just east of November. Normally the annual weather follows a pattern from rain to sun and warmth, which nurtures the trees with energy and vitality. The [...]

The El Carmen mill is in the city of Diriamba, south of was a devastating rust infection that affected 35% of the trees in the region. This damage to the trees resulted in [...]

READ MORE





Coffee cherries are packed with nutrition. It happens that they can be milled into one of the most uniquely dynamic and flavor-rich alternative (gluten free, that is) flours out there.

**NATURAL WHOLE WHEAT FLOUR**

5x more fiber than whole grain wheat flour.

3x more iron than fresh spinach, and more iron than any grain or cereal in the USDA database.

**COCONUT FLOUR**

84% less fat and 42% more fiber than coconut flour.

Contains less caffeine than brewed coffee. The amount per serving is dependent on the varietal, concentration and particular recipes.

**KALE**

3x more protein per gram than fresh kale.

1oz of coffee flour™ has 2x the potassium of a banana.

# recipes



**Pasta Dough**     **Superfood Granola**     **Shortbread**



coffee flour
the new global impact food

August 13, 2014 Office Action at 5-6.

All of these pages, including the website's masthead page, use "coffee flour" in lower case lettering as a compound noun, without an accompanying generic term. "Coffee flour" is called "one of the most uniquely dynamic and flavor-rich alternative (gluten free, that is) flours out there" and "an agricultural innovation with the potential to do some really great things for the world." "Coffee flour's" nutritional properties are compared to those of other generic types of flour, including wheat flour and coconut flour, as well as generic types of produce, including kale and bananas, with one comparison claiming that "1 oz. of coffee flour™ has 2x the potassium of a banana."[23] The "news update" page discusses the use of "coffee flour™" as an ingredient, and states that "coffee flour™" could mitigate Mexico's bad coffee harvest and create new jobs in Nicaragua, echoing themes in Applicant's video. The "recipes" page shows a product label that states that shortbread cookies can be made with "25% coffee flour."

As discussed in more detail below, Applicant's use of "coffee flour" in lower case letters on these pages is a classic example of the use of a putative mark as a generic term, particularly given that capitalization is used elsewhere on the pages. *See, e.g., Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1492 (TTAB 2017), and cases cited therein. In context, these uses all communicate that "coffee

---

[23] We can infer from Applicant's use of the symbol ™ next to the words "coffee flour" that Applicant intended to communicate to the public through the use of the symbol that Applicant claimed the words as its trademark. The mere "[u]se of the letters '™' on a product does not make unregistrable matter into a trademark," *In re Remington Prods. Inc.*, 3 USPQ2d 1714, 1715 (TTAB 1987), and Applicant's use is significant only if it contributed to educating the public to understand that "coffee flour" is something other than a generic term.

flour" refers to a new type of flour made from coffee cherry skins, pulp and pectin, which can be used as an ingredient and which is comparable to other traditional and non-traditional, but generic, types of flours. The uses identify a product, not a particular producer of that product, and Applicant does not provide any term other than "coffee flour" to use to refer to flour made from coffee cherry skins, pulp and pectin.

We turn next to Applicant's revised webpages made of record by the Examining Attorney in October 2015. October 15, 2015 Office Action at 65-67, 72.



…An agricultural innovation with the potential to do some really great things for the world. And we don't just mean the food world.

Each year the billions of coffee beans that eventually make their way into the Americanos, lattes, and no-foam, extra-hot, triple-shot cappuccinos of the world are harvested by milling and extracting them from the coffee plant. The surrounding fruit, is discarded. It often gets dumped into rivers or left to rot in heaps. So we invented something better to do with it. Something that's better for everyone.



For farmers and families in coffee growing countries, it will create sustainable jobs and a new revenue source for some of the poorest areas of the world. For the environment, it will remove botanical waste from streams and soil, strengthening the land and lives of the people and species there. And for the rest of us, it will add a nutritious and distinctly flavorful ingredient to the global menu.

We have a passion for coffee, and for the people, and communities who grow it. So finding a use for that discarded fruit became our purpose. We pioneered a process that converts this coffee byproduct into a nutrient-dense new super-ingredient we call CoffeeFlour® .

What we're most proud of is that we've structured our business model so that the positive social, environmental, and economic impacts will be shared by all.

*CoffeeFlour® is set for commercial rollout in 2015. Please contact us if you are interested in participating.

## whole coffee news

The CoffeeFlour® global community is growing every day. From celebrity chefs, and food companies, to wonderful news about environmental and economic impact. Check this space often to see how the story keeps evolving, and how you can get involved.







**Brooklyn Roasting Company becomes the first coffee shop in the United States to offer CoffeeFlour® pastries**

**Dan Barber, sustainable food movement leader, features CoffeeFlour® on his menu at Blue Hill**

**CoffeeFlour® steals spotlight at MasterChef Australia**

On June 24, 2015 CoffeeFlour® launched a new line of sustainable CoffeeFlour® pastries and

For two weeks in March, CoffeeFlour® was included as an ingredient in a series of featured

Contestant Rose Adam blows judges away with her 'coffee flour tart with acacha curd and ant

http://www.coffeeflour.com/        10/09/2015 03:42:12 PM

line of sustainable CoffeeFlour® pastries and baked goods at Brooklyn Roasting Company, an industry leader devoted to sustainability. Crafted by gluten-free baking company, Izzy & Em's, the new offerings include CoffeeFlour® brownies, cookies and coffee cake; this marked the first time that CoffeeFlour® products were available for purchase in the [...]

included as an ingredient in a series of featured dishes in Dan Barber's WastED pop up at Blue Hill in New York. All dishes were made entirely from ingredients formerly considered waste products. (AP Photo/Mary Altaffer)

praline'. Watch the clip from the episode here. (Photo courtesy of MasterChef Australia)

**READ MORE**

## global impact

CoffeeFlour® is in production in 3 continents and growing quickly. We are now converting waste into benefit in Hawaii, Nicaragua, Guatemala, Mexico, and Vietnam. But our mission is a global one, so join our movement and help achieve the greatest sustainable impact possible.





1oz of CoffeeFlour® has 2x the potassium of
a banana.

### recipes

CoffeeFlour® is an incredibly versatile ingredient. Surprisingly, CoffeeFlour® doesn't taste like coffee, but rather expresses more floral, citrus and roasted fruit-type notes. This is why it's such an interesting ingredient in things like breads, cookies, muffins, squares, brownies, pastas, sauces, beverages, and so much more. We've only just begun and already we've had incredible success cooking and baking with CoffeeFlour®. Check out some of our favorites.

Like Applicant's 2014 webpages, these 2015 webpages use "coffee flour" as a compound noun, unaccompanied by another generic term, to identify a product that is again described as "[a]n agricultural innovation with the potential to do some great things for the world" and "an incredibly versatile ingredient." They discuss the "CoffeeFlour® global community" and the fact that CoffeeFlour® "was included as an ingredient" in a series of dishes served at a pop-up restaurant in New York, all of which "were made entirely from ingredients formerly considered waste products."

These pages again use "coffee flour" to identify a product, not a particular producer of that product, and like their earlier counterparts, they do not provide anything other than the words "coffee flour" to use in referring to flour made from coffee cherry skins, pulp and pectin. For example, the headline of the first page in this group reads "coffee flour® is . . ." This use of the words "coffee flour" is particularly probative because it expressly states that "coffee flour is" a thing and the text directly below the use

"'tell[s] you what the thing is.'" *In re Noon Hour Food Prods. Inc.*, 88 USPQ2d 1172, 1180 (TTAB 2008) (quoting *In re Abcor Dev. Corp.*, 588 F.2d 811, 200 USPQ 215, 219 (CCPA 1978) (Rich, J., concurring)).

These pages differ from their 2014 counterparts in two respects. First, for the most part they display the words "coffee flour" in compressed form as "CoffeeFlour," with initial capital letters used in the two words, rather than as two separate words. This compressed depiction of the proposed mark is irrelevant to our analysis because Applicant seeks registration of COFFEE FLOUR in standard characters, and thus must have the genericness of its proposed mark "assessed without limitation to any particular depiction of that term." *In re Calphalon Corp.*, 122 USPQ2d 1153, 1160 (TTAB 2017) (proposed mark SHARPIN in standard characters found to be merely descriptive without consideration of one of its actual depictions as SharpIN). Even if we considered this particular depiction, however, "minor variations, such as spacing and upper- versus lower-case letters, in the display of a generic term (e.g., 'cloud TV,' 'Cloud TV,' 'CloudTV' or 'CLOUDTV') typically are legally insignificant and do not avoid a finding of genericness." *ActiveVideo*, 111 USPQ2d at 1604. Because "[w]e find no evidence that Applicant's compressed version of [CoffeeFlour] has another meaning or would be perceived as anything other than a reference to" coffee flour, *id.*, and because it is nowhere accompanied by another generic term, Applicant's use of the compressed words does not avoid a finding of genericness on this record. *Cf. Plyboo Am. Inc. v. Smith & Fong Co.*, 51 USPQ2d 1633, 1638 (TTAB 1999) (Board found in descriptiveness opposition that evidence showed that applicant's "term

'plyboo' is clearly used as a trademark for applicant's goods—in that the first letter of such term (like a proper noun or proper adjective) is capitalized, or the term is otherwise set off by quotation marks, *and* the term is followed (or preceded) by generic terminology for the goods. . . .").[24]

Second, these pages show Applicant's use of the federal registration symbol ® next to the words "CoffeeFlour," in place of the "™" symbol that had been used on the earlier webpages discussed above. A magnified example of Applicant's use of the registration symbol on these pages is reproduced below.

coffee flour® is...

We can infer from Applicant's use of the registration symbol that Applicant intends to communicate to the public not just that Applicant claims the words "coffee flour" (or "CoffeeFlour") to be its trademark, but that it has actually registered the words alone as its trademark.[25] That message was (and is) false, and Applicant's use of the registration symbol next to the words "coffee flour" on its website and in the two press releases in the record was (and is) improper.[26] In any event, the record as a whole

---

[24] The fact that the compressed words "CoffeeFlour" are depicted with initial capital letters on Applicant's website and elsewhere in the record similarly "does not compel a different result." *Capital Project Mgmt. Inc. v. IMDISI Inc.*, 70 USPQ2d 1172, 1179 (TTAB 2003) (finding "time impact analysis" to be generic even though "the term often appears in print in initial capital letters, that is, 'Time Impact Analysis.'").

[25] We can also infer from Applicant's prior use of the ™ symbol that Applicant knows the difference between the ™ and ® symbols.

[26] It is improper to use the federal registration symbol in connection with an unregistered mark. *Copelands' Enters. Inc. v. CNV Inc.*, 945 F.2d 1563, 20 USPQ2d 1295, 1298 (Fed. Cir. 1991); *see* 15 U.S.C. § 1111. Applicant does not own a registration of the words "coffee flour" alone. When the webpages displaying use of the registration symbol were downloaded by the Examining Attorney in October 2015, Applicant owned Registration No. 4806487 for a

shows that Applicant's misuse of the registration symbol has not caused the public to understand "coffee flour" to be something other than a generic term for flour made from coffee cherry skins, pulp and pectin.[27]

Like its specimen and promotional video, Applicant's website does not use its proposed generic terms, or any others, to identify the new flour made from coffee cherry skins, pulp and pectin. Only the compound noun "coffee flour" is used for that purpose. The compressed manner of depiction of the compound noun "coffee flour," and the use of trademark symbols with it on Applicant's website, do not convert it into a trademark.

Applicant's uses of its proposed mark in its own materials discussed above make it clear that when it brought "out a new and unfamiliar product [it did] not give the product an easily recognizable generic name *in addition to* the term which [it] considers to be its trademark." *McCarthy*, § 12.26. Under the circumstances, Applicant would have been better off devising "*two* new words—the mark and the generic name," *id.*, but failed to do so.[28] Instead, it used "coffee flour" itself as the

---

stylized depiction of the words "coffee flour," but Applicant had disclaimed the exclusive right to use the words "coffee flour" apart from the mark as shown. October 15, 2015 Office Action at 5. When fraudulent misuse of the registration symbol, i.e., use with the intent to deceive the purchasing public or others in the trade into believing that a mark is registered, is conclusively established, the fraud defeats an applicant's right to a registration. *See Copelands*, 20 USPQ2d at 1298 (citing *Johnson Controls, Inc. v. Concorde Battery Corp.,* 228 USPQ 39, 44 (TTAB 1985)). The record in this case is not developed with regard to this issue.

[27] We leave for another day the question of whether an applicant could ever legitimately rely upon evidence involving its misuse of the registration symbol to prove that it has educated the public to view its proposed mark as something other than a generic term.

[28] This failure may be due to the fact that "as a marketplace reality, the apt term '[COFFEE FLOUR]' is much shorter and more nimble than the cumbersome phrases that Applicant offers as generic alternatives." *ActiveVideo*, 111 USPQ2d at 1605. Whatever the reason, Applicant's failure to use any alternative to "coffee flour" as the generic term for its new flour

generic name for its new and unfamiliar flour made from coffee cherry skins, pulp and pectin. Through its own uses of "coffee flour" in its marketing communications, Applicant promulgated "coffee flour" to the public as the generic name for flour made from coffee cherries. Applicant's own uses provide "damaging evidence that its alleged mark is generic and would be perceived by the purchasing public as merely a common name for its goods rather than a mark identifying the good's source." *Gould*, 5 USPQ2d at 1112.

We turn next to a review of the record evidence showing the public's use of the proposed mark COFFEE FLOUR.

### c. Communications Involving Applicant's Participation or Input

The record contains a number of articles regarding Applicant's new product, including several in which Applicant's principals Dan Belliveau and Andrew Fedak are quoted, or in which statements are attributed to them, to Applicant generally, or to Applicant's apparent affiliate CF Global. These articles "may be considered probative evidence of the meaning [COFFEE FLOUR] may have in the marketplace." *Plyboo*, 51 USPQ2d at 1640 (internal quotation omitted). The record also contains a joint press release issued by Applicant and a retailer.

These materials are especially probative on the second *Marvin Ginn* inquiry. Applicant's contacts with the news media in the course of the preparation of the articles, and the nature of the joint press release, gave Applicant the opportunity to

---

made from coffee cherry skins, pulp and pectin contributed to the public's understanding that "coffee flour" is the generic term for the new product.

influence the use of its proposed mark in these communications to the public, and to avoid misuses as a generic term. The articles and the press release are thus directly relevant to our inquiry regarding whether Applicant policed the use of "coffee flour" by others and took steps to educate the public to use some name other than "coffee flour" as the generic term for Applicant's new product.

An April 2014 article in the *Seattle Times*[29] described Applicant as "a local startup [which] is trying to make a new culinary staple out of coffee flour." It explained that coffee flour is "made by grinding the dried pulp of coffee cherries, the fleshy coverings of the beans, which are usually thrown out." A statement was attributed to Mr. Belliveau that "[t]he resulting product can be baked into bread, cakes and doughnuts." Statements were also attributed to Applicant, or to Mr. Belliveau personally, that "[c]offee flour doesn't taste like coffee, but has more 'floral, citrus and roasted fruit-type notes," that "up to 8 billion pounds of coffee flour could be produced worldwide per year if the coffee crop is appropriately utilized by flour millers," and that Mr. Belliveau "sees coffee flour as a supplement to other flours, not a full replacement. Unlike many gluten-free flours, it has good binding qualities, he said." A statement attributed to "coffee-flour advocates" said that "it has five times more fiber than the conventional wheat variety, and 84 percent less fat than coconut flour."

The article also discussed mixed early results from the use by restaurants of "coffee flour" as an ingredient in cake and pasta, but stated that "dialing the coffee flour component down to a quarter and adding almonds, eggs and other flours worked

---

[29] October 15, 2015 Office Action at 38-40.

well" in one recipe. The article quoted Jason Wilson, a Seattle restaurateur, as stating that the "robust flavor" of coffee flour has made it a "key ingredient in a variety of dishes on our menu."

The article repeatedly used "coffee flour" in lower case letters as a compound noun in its title and body, and it attributed similar uses to Mr. Belliveau and Mr. Wilson. "Coffee flour" was referred to as a product, an ingredient, and a component, not as a trademark, and its nutritional properties were compared to those of other flours, including by "coffee-flour advocates." We can infer from these uses of "coffee flour" in the article that the author, Mr. Belliveau, Mr. Wilson, and the unidentified "coffee-flour advocates" all understood "coffee flour" to be a generic term. *Noon Hour*, 88 USPQ2d at 1179.[30] Readers of this article, and the others discussed below, would understand "coffee flour" to refer to a type of flour made from coffee cherry skins, pulp and pectin.

The *Seattle Times* article was referenced in an article several weeks later that appeared on the website thekitchn.com.[31] The website article discussed "the newest in an already robust line-up of alternative flours: *coffee flour*." It stated that "[t]his very new gluten-free flour is made from the pulp of coffee cherries and is apparently super high in protein." It stated that the "company in charge of spearheading the new flour insists that it actually doesn't taste like coffee, but more citrusy with fruit notes." The author asked the rhetorical question "why this?" product given "all the

---

[30] We draw a similar inference from the uses of "coffee flour" in the other articles discussed below.

[31] October 15, 2015 Office Action at 47-48.

new food products and flours out on the market today," and stated that "the answer to that question in regards to coffee flour could be the nutrition and the extra option for gluten-free folks." The author compared "the flour" favorably to conventional wheat flour and coconut flour generally, rather than to specific brands of wheat or coconut flour.

This article also used "coffee flour" in lower case lettering as a compound noun to refer to a new flour. It alluded to Applicant, "the company in charge of spearheading the new flour," but did nothing to suggest that the company claimed "coffee flour" to be its trademark rather than the name of the "new flour" that it was spearheading.

An April 2014 article from *The Atlantic* magazine[32] explained the production of "coffee flour" from coffee cherries. It stated that Applicant's affiliate CF Global "is trying to reclaim the coffee cherry. Its big idea is this: to take the remnants of the process that turns the coffee bean into a beverage … and turn them into food. The result of this? CoffeeFlour, a food ingredient that's made from discarded coffee cherries." It attributed a statement to CF Global that the end result of its process is "a flour that can, CF Global says, mimic traditional flour." "Coffee Flour, the company claims, can be used in pasta and baked goods," and for multiple other uses. This article displayed the words "CoffeeFlour" in the compressed form seen on Applicant's website, but used those words as a compound noun to refer variously to a food, an ingredient, and a flour.

---

[32] March 16, 2015 Office Action at 7-8.

An April 2014 article from *Bloomberg Business* entitled "Introducing Coffee Flour"[33] began by stating that "[t]wo years ago Dan Belliveau hit upon the idea for a new product: Coffee Flour." After explaining the historic disposal of coffee cherries during coffee production, the article stated that Mr. Belliveau "took it upon himself to create a rudimentary coffee berry flour and began experimenting." It stated that his company has "developed a patent-pending process for the milling of commercial-grade coffee flour," which the article described as a product that "has three times more iron than spinach, three times more protein per gram than kale, and five times more fiber than whole grain flour." It also stated that "coffee flour is best used in combination with other grains." It quoted Mr. Belliveau as saying that "[m]ost flours are somewhere between 5 and 12 percent fiber. Coffee flour is 55 percent fiber," and stated that CF Global "plans to produce about 350,000 pounds of coffee flour this year." This article used "coffee flour" to refer to "a new product" that Applicant intended to produce, in commercial-grade quality and in large quantities, and that is more nutritious than other flours. There was no use of a different generic term for the "new product" and no suggestion that "coffee flour" is a brand name.

A July 2014 article from the United States edition of *The Guardian*[34] purported to answer readers' questions regarding "edible coffee" arising from "a recent article on the use of coffee cherries to make flour." The article stated that Mr. Belliveau "developed a new use for coffee cherry – Coffee Flour, advertised as a gluten-free

---

[33] October 15, 2015 Office Action at 23-25.

[34] October 15, 2015 Office Action at 42-44.

product that has five times more fiber than whole grain wheat flour, three times more protein than kale and other health and environmental benefits." It went on to say that it "picked several comments from our readers and turned to experts to find the answers to their questions." One of the comments pertained to whether it was better to turn coffee cherries into compost for local use rather than into coffee flour for export. The article responded by attributing a statement to Mr. Belliveau that "the Coffee Flour program was structured in a way that lets local food manufacturers – those in locations where the flour is produced – create products that are consumed locally." He was quoted as saying that *"[o]ur goal is to have 50% of the coffee flour remain in the country of origin and the balance exported."* (Emphasis added.)

This article used "coffee flour" to refer to a product. Mr. Belliveau's statement that Applicant's goal "is to have 50% of the coffee flour remain in the country of origin," with the rest exported, made it clear that "coffee flour" is a product that can have multiple sources, including local food manufacturers, not Applicant's trademark for a single source of the goods.

An October 2014 article from foodrepublic.com, entitled "Coffee Flour: Rich in Antioxidants and Makes a Pretty Good Cookie," and subtitled "Learn to bake with flour made from coffee berries,"[35] described "coffee flour [as] an elegant solution to an ugly problem" and recounted the author's visit with Applicant's principal Andrew Fedak. The author stated that after "five months, a handful of missed connections and scads of e-mails, this was it: I was finally going to taste coffee flour." When he

---

[35] October 15, 2015 Office Action at 31-33.

arrived at Mr. Fedak's office, he was greeted with a "bag of coffee flour chocolate chip cookies" and was later given "some of the flour."

The author described cooking and baking with "coffee flour," including making oatmeal cookie bars with "coffee flour" rather than oat flour and using it in cooking blackened catfish, where the "coffee flour blended with the oregano and thyme in the recipe." He wrote that when he tasted the fish, he understood "why Fedak said that the coffee flour made a good addition to pork carnitas and chicken mole." The author lamented the limited supply of the product, and recounted Mr. Fedak's statement "that the flour, which is currently being taste-tested with consumer focus groups, will have a wide roll-out in 2015" and his estimate "that within a few years, the company will be producing millions of pounds of coffee flour per year." The uses of "coffee flour" in this article, including those attributed to Mr. Fedak, referred to a product; they described it as an ingredient in foods and a substitute for other flours in baking.

In a June 2015 interview of Mr. Belliveau by the website at munchies.vice.com, which was intended "to talk about coffee flour's conception and its potential to reduce waste and boost the incomes of famers around the world,"[36] "coffee flour" was used to refer to "a high-protein, high-fiber, gluten-free 'flour' that's the result of slow-drying coffee cherry pulp and grinding it into a fine powder." "Coffee flour" was identified as having been used as an ingredient in sorbet, brownies, coffee cakes, cookies, and other foods.

---

[36] October 15, 2015 Office Action at 52-54.

Mr. Belliveau did not characterize or use "coffee flour" as Applicant's trademark in his answers to the interviewer's questions. To the contrary, in response to the question "Can you tell me how you got the idea for coffee flour?," he explained that "the words 'coffee flour' just came into my head" when he was discussing what to do with coffee cherries with a coffee producer, and in response to the question "What does coffee flour taste like, and how can it be used in cooking?," he described how "[s]ome of the acids in the coffee flour mask some of the bitter notes in chocolate," making coffee flour a useful ingredient in baking. He explained that millions of pounds of "dried coffee flour" can be extracted from a large quantity of wet coffee cherries.

The munchies.vice.com interview occurred more than a year after the appearance of the first articles regarding Applicant's new product, but it used "coffee flour" in lower case lettering as a compound noun to identify a product. There was no effort whatsoever by Applicant to inform readers that "coffee flour" is a trademark.

In an article entitled "There's So Much More to This Gluten-Free Flour Than Delicious Pastries" from takepart.com in July 2015,[37] the author attributed statements to both of Applicant's principals, and quoted Mr. Fedak. The flour discussed in the article is identified as "CoffeeFlour [which] is the chestnut-hued, gluten-free flour milled from dried cherry pulp." A statement was attributed to Mr. Fedak that at a coffee mill in Nicaragua, "Coffee Flour created 70 new jobs, 90 percent of which went to women." The article also noted that "[o]ne of the criticisms of

---

[37] April 14, 2016 Request for Reconsideration at 2-4.

CoffeeFlour is that it would divert coffee pulp from farmers who use it as fertilizers for their coffee plants." A response was attributed to Mr. Fedak that "there is more than enough to go around."

The takepart.com article used "CoffeeFlour" to refer to a product, a gluten-free flour made from coffee cherries, not a brand of that product, and no generic term for the product other than "CoffeeFlour" was provided. Mr. Fedak's statements that some coffee flour can remain in coffee-producing communities made reference to a thing, not a brand.

Applicant jointly issued a press release with Sprouts Farmers Market, a food retailer described as "a healthy grocery store offering fresh, natural and organic foods at great prices."[38] We can infer from its nature and contents, and the attribution of statements in it to Mr. Belliveau, that Applicant participated in its drafting or at least reviewed it before it was disseminated to the public. The press release primarily used "CoffeeFlour®" to identify Applicant as a corporate entity, but it also used "CoffeeFlour®" to refer to "the new global impact food," a "primary ingredient" in Sprouts' new pastries, an "ingredient" invented by Mr. Belliveau, and "an agricultural innovation." Readers of the press release had nothing other than "CoffeeFlour" to use to refer to the new product and ingredient.

### d. Other Communications

We turn finally to two articles and a press release that discuss Applicant's new product, but do not appear to reflect any direct input by Applicant.

---

[38] April 14, 2016 Request for Reconsideration at 11-12.

An April 2014 article from huffingtonpost.com[39] discussed "[a] new product, coffee flour." It stated that "[t]his product has examined the waste created in coffee production - like all those cherries that house the coffee beans we so revere – and strives to turn it into a positive." The new coffee flour "could be a great thing for coffee farmers, giving them another source of revenue; and it could also be great for those who love to cook, giving us another ingredient to play with." The article stated that coffee flour had already been used in pasta, cakes, and cookie recipes, that its nutritional properties compared favorably to those of wheat flour, kale, and spinach, and that it had an extra "perk" by being caffeinated.

This article used "coffee flour" to refer to a product, a new type of flour made from coffee cherries. It did not identify or mention Applicant, except to the extent that the ambiguous statement "Coffee flour, as you can deduce from the name, has turned this fruit into a flour and hopes to bring the product into the mainstream market in 2015" could be read to identify a company instead of the new product itself.

A July 2015 article from eatclean.com entitled "Coffee, Almond, Quinoa, Rice: Which Gluten-Free Flour Should You Buy?,"[40] compared various types of gluten-free flours to one another. The article listed "banana" and "coffee" as examples of "Unusual Flours." It stated that "[c]*offee flour, made from the pulverized coffee fruit (basically, what's left over after the coffee bean is harvested), is brand new to the scene*" (emphasis added), but that one gluten-free bakery was "already using the stuff in brownies and

---

[39] October 15, 2015 Office Action at 35-36.

[40] October 15, 2015 Office Action at 26-29.

cookies." It noted that neither banana flour nor "coffee flour" has much structure, but that "[c]offee flour is rich in fiber, protein, iron, and potassium," and also has some caffeine. It concluded by stating that you "can't buy coffee flour yet, but the folks at coffeeflour.com say it should be hitting stores sometime this year."

This article used "coffee flour" as a compound noun to refer to an unusual new flour, which the article compared to other types, rather than brands, of gluten-free flours, and explained could be used as an ingredient in cooking and baking. It alluded to Applicant, but did nothing to suggest that "coffee flour" is Applicant's trademark instead of the generic term for the new flour made from pulverized coffee fruit.

A 2016 press release from Seattle Chocolate Company[41] introduced "the first-to-market Coffee Flour®-infused chocolate bar." It depicted through graphics the production of "CoffeeFlour®," which the release stated "is made from dried coffee cherry pulp, a former waste product that is milled into a nutrient-dense, flavor-rich ingredient" and "enhances the distinct flavor profile and nutritional value." It stated that the "inclusion of CoffeeFlour® enhances the new joco chocolate bar with a berry-forward flavor" and touted the fact that Seattle Chocolate Company "is the only chocolate confectioner in the world to be incorporating this superfood newcomer." "CoffeeFlour®" was also referred to as the "new global impact food" and a "nutrient-rich ingredient suitable for cooking and baking." This press release used "CoffeeFlour®" to refer to a superfood, an ingredient, the new global impact food, and

---

[41] April 14, 2016 Request for Reconsideration at 13-14.

a flour made from the coffee cherry pulp without providing a generic term other than "coffee flour" for these things.

### e. Applicant's Arguments Regarding the Evidence of the Public's Use and Understanding of COFFEE FLOUR

Applicant advances three primary arguments in the face of this evidence of the public's use and understanding of COFFEE FLOUR as a generic term.

First, Applicant argues that the "articles submitted by the Examining Attorney that reference 'coffee flour' are all about Applicant and/or Applicant's products. No third-party uses of 'coffee flour' as a generic term are included. Thus, the relevant public would not understand COFFEE FLOUR as a genus of goods." 13 TTABVUE 13-14.

The articles in the record are all "about Applicant and/or Applicant's products" because Applicant was the first, and currently is the only, seller of flour made from coffee cherries. But this is not dispositive of the public's understanding of the meaning of "coffee flour." The relevant question is how the proposed mark COFFEE FLOUR is used in the articles. In *Greenliant*, the applicant was the first and only user of the term at issue, and similarly argued that the fact that the media articles in the record were almost all about applicant was "strong evidence that the public regard[ed] the term NANDRIVE as a trademark for Applicant's goods." 97 USPQ2d at 1084. The Board rejected that argument and found NANDRIVE to be generic, even though some of the uses of the term in the articles were ambiguous as to whether they used NANDRIVE as a generic term or as a trademark. Here, unlike in

*Greenliant*, there is nothing ambiguous about the uses of "coffee flour" as a generic term in most of the articles in the record.

Second, Applicant argues that "[i]f the evidence of record does not show that competitors use the term at issue, it creates doubt as to whether the term actually primarily refers to a genus of goods or services and whether competitors can effectively identify their goods or services without using that particular phrase," and that as "was the case in In re Trek 2000 Int'l Ltd., the Examining Attorney's evidence of record contains no examples of competitors or other third parties using the Applicant's mark." 13 TTABVUE 15. *Trek* did not hold, however, that competitive uses must exist for a term to be generic. *Trek* must be understood in conjunction with the well-settled principle that being the first and only user of a generic term—even if the public associates it with the first user—does not make an otherwise generic term non-generic.[42]

In addition, the case is easily distinguishable on its facts. In *Trek*, the Board held that "where the evidence does not show that competitors use the designation in issue, *this may create doubt, depending upon the totality of the record, as to whether a term primarily refers to a genus of goods* such that 'sellers of competing brands cannot

---

[42] *See, e.g.*, *Merrill Lynch*, 4 USPQ2d at 1142 ("To allow trademark protection for generic terms, *i.e.*, names which describe the genus of goods being sold, even when these have become identified with a first user, would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are."); *In re Preformed Prods. Co.*, 323 F.2d 1007, 139 USPQ 271, 273 (CCPA 1963) (exclusive use, even when coupled with "large sales volume of such goods and its substantial advertising expenditure . . . cannot take the common descriptive name of an article out of the public domain and give the temporarily exclusive user of it exclusive rights to it, no matter how much money or effort it pours into promoting the sale of the merchandise") (citing *J. Kohnstam, Ltd. v. Louis Marx & Co.*, 280 F.2d 437, 440 (CCPA 1960)).

compete effectively without using the name to designate the product they are selling.'" *Trek*, 97 USPQ2d at 1109 (emphasis added) (quoting *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 69 USPQ2d 1213, 1215 (7th Cir. 2003)); *see also KP Permanent Make-Up,* 72 USPQ2d at 1838 ("there [is] no indication that the [Lanham Act] was meant to deprive commercial speakers of the ordinary utility of descriptive words"). The record in *Trek* showed "use of the term THUMBDRIVE or THUMB DRIVE to refer to a genus of goods" but also showed "the origin of the term as a trademark and extensive use of the term as a trademark," the applicant's use "of other terminology as the name of the goods, e.g., 'external storage device,'" successful efforts by the applicant to police the misuse of its claimed mark as a generic term, and no use of the term by competitors "after ten years of these products being on the market . . . ." *Id.* at 1112-13. The Board concluded, on the totality of that record, that "'the evidence of generic use is offset by applicant's evidence that shows not only a significant amount of proper trademark use but also trademark recognition' by third parties." *Id*. at 1113 (quoting *In re America Online Inc.*, 77 USPQ2d 1618, 1623 (TTAB 2006)).

Unlike the record in *Trek*, the record here is not "mixed . . . on the question of genericness." *Id*. It shows use of "coffee flour" almost exclusively to refer to a genus of flour made from coffee cherry skins, pulp, and pectin. The absence of competitive uses of "coffee flour" generically is attributable to the fact that there are not yet any competitors. We agree with the Examining Attorney that "this circumstance should not prevent later competitors from using this shorthand generic designation to refer to flour made from the coffee plant." 15 TTABVUE 11. Applicant's current status as

the only user of "coffee flour" "does not justify registration if the only significance conveyed by the term is that of the category of goods," *Greenliant*, 97 USPQ2d at 1084, as it is here.

Third, Applicant argues that COFFEE FLOUR is registrable on the Supplemental Register because it "describes Applicant's product, but it does not define a major class or kind of product." 13 TTABVUE 12. This argument goes as follows:

> Applicant's mark does describe features of Applicant's goods. A consumer who sees the mark COFFEE FLOUR is likely to recognize the overall nature of Applicant's goods – that it is a coffee product ground up into a powder like flour. Applicant contends, however, that the consumer will assume (incorrectly) that the product is made from coffee beans, tastes or smells like coffee, or contains the drink coffee. The mark is not, therefore, the genus for flour made of the skins, pulp, and pectin of the coffee cherry. While COFFEE FLOUR may describe the goods or convey knowledge of the qualities or characteristics of the goods, it does not "immediately and unequivocally" describe flour made of the skins, pulp, and pectin of the coffee cherry, and therefore, it is not generic.

13 TTABVUE 13.[43]

Applicant acknowledges that "a consumer who sees the mark COFFEE FLOUR is likely to recognize the overall nature of Applicant's goods – that it is a coffee product ground up into a powder like flour." 13 TTABVUE 13. This is essentially Applicant's confirmation that the term is the name for Applicant's goods, *i.e.*, that it is generic. To insist that the test for genericism require that consumers also know all the precise

---

[43] This argument actually contends that COFFEE FLOUR is misdescriptive of a feature of Applicant's goods because they will be perceived as being made from the coffee bean when they are actually made from the coffee cherry. It is not necessary to consider this argument because we find, on the basis of the record as a whole, that COFFEE FLOUR is generic. *In re Northland Aluminum Prods., Inc.*, 777 F.2d 1556, 227 USPQ 961, 963 (Fed. Cir. 1985).

attributes of the product and how it is made demands too much. In any event, the record here shows that the relevant purchasing public understands "coffee flour" to refer specifically to flour made from the skin, pulp, and pectin of the coffee cherry portion of the coffee plant. Applicant itself has communicated this meaning of the term "coffee flour" to the public, and the articles in the record, from which we can infer the public's understanding of the term, show that this message has been received and understood.

### f. Summary of Analysis of the Relevant Purchasing Public's Understanding of the Meaning of COFFEE FLOUR

The record shows consistent use—by both Applicant and the public—of the words "coffee flour" as a compound noun to refer to flour made from coffee cherry skins, pulp and pectin, and, at best, minimal use—by Applicant or the public—of "coffee flour" as a trademark (a brand name for a product identified by a separate generic term for the goods). There is no evidence of Applicant's or anyone else's use of the alternative generic terms suggested by Applicant, or any other separate generic term. "Coffee flour" is variously referred to in the record as a new type of flour, a product, an ingredient, a superfood, and the "new impact food for the world," but never as the brand name for a product identified by another generic term.

The record show that Applicant failed to develop and promulgate a generic term other than "coffee flour" and "to educate the public to use some name other than the term [it] wants to call [its] mark." *McCarthy*, § 12:25. Applicant both actively and tacitly encouraged the public's generic use of "coffee flour." Applicant used "coffee

flour" as a generic term in its public-facing materials, and its principals used "coffee flour" as a generic term in their interactions with the media.

The record also does not show that Applicant took any steps to have the media correct their own generic uses of "coffee flour." Applicant's failure to police these generic uses of its proposed mark undercuts its claim that the relevant purchasing public will understand COFFEE FLOUR to be anything other than the generic term for flour made from coffee cherries. *Cf. Trek*, 97 USPQ2d at 1112 (record included examples of applicant's policing of its asserted trademark, including "letters to and responses from various media outlets, including PC Magazine' and 'The New York Times,' whereby they agreed not to use THUMBDRIVE in a generic manner."); *Plyboo,* 51 USPQ2d at 1640 (evidence of media use of applicant's proposed mark included evidence of correction of article using mark as a generic term).

Upon consideration of all of the evidence of record, we find that the Examining Attorney demonstrated, by clear evidence of generic use, that "coffee flour" is understood by the relevant purchasing public primarily to refer to flour made from coffee cherry skins, pulp and pectin.

**Decision**: The refusal to register on the Supplemental Register is affirmed.